ALLEN v. TRUEMAN, Judge of the Second Judicial Dist., et al.

No. 6194.   Decided February 3, 1941.   (110 P. [2d] 355.)

38

*A. U. Miner and Irvine, Skeen, Thurman & Miner,* all of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., and *Fabian, Clendenin, Moffat & Mabey,* of Salt Lake City, for defendants.

BAKER, District Judge.

This action involves the constitutionality of section 95-2-10, R. S. U. 1933, as amended by Chap. 110, Laws Utah 1939. That section, with some deletions for the sake of brevity, reads as follows:

40

"Any person may make affidavit before a court of competent jurisdiction that he has reason to believe, and does believe, setting forth the facts upon which such belief is based that any receptacle, container, carrier, box, equipment or supplies bearing or having stamped, impressed or produced thereon, the name, mark, brand or device, claim to which has been filed and published as provided by law, is, or are, in the possession of any person other than the owner thereof in violation of the provisions of any statute or that any such receptacle, container, carrier, box, equipment or supplies is, or are secreted in any place specified in such affidavit. The court may thereupon examine on oath the complaint and any witnesses that may be produced or subpoenaed and take their depositions in writing. If it shall appear from the affidavit or from the affidavit and deposition or depositions that there is probable cause to believe that any such property is unlawfully possessed or secreted as aforesaid, the court shall issue a search and seizure warrant for such property.

"The warrant shall be directed generally to any peace officer of the state of Utah and shall require him to take such property into his possession and hold the same subject to the order of the court.

"Any peace officer to whom such warrant is delivered shall execute the same in the daytime anywhere within the state. * * *

"After taking the property into his possession the officer must forthwith return the warrant to the court with a written inventory of the property seized thereunder.

"Upon the filing of the officer's return the court shall order him to hold the property seized pursuant to the warrant until otherwise ordered by the court. The court shall thereupon give notice of a hearing to be held to determine the right to the possession of said property. Notice of said hearing shall be given by posting notice of such hearing at the place where said property was seized and notice shall be served upon the person, if known, from whose possession the property was taken by the officer seizing the same. Notice shall also be served upon the owner of said property as shown by the records of the secretary of state and upon such other persons as the court shall have reason to believe have any interest in the seized property.

"At the hearing any person appearing and asserting any interest in writing to any of the seized property, shall be made a party defendant. The court shall then proceed to the trial of the issues as made by the claims of the parties to said action and shall determine the party entitled to possession of said property and shall order the return of same to said party."

In order to comprehend better the full import of the fore-going it is necessary to state the substance of the broader statutory provision of which it is a part. Section 95-2-10, above quoted, is a part of Title 95, Chap. 2 of R. S. U. 1933. That title is, generically, "Trade-Marks And Trade Names," and said Chap. 2 is subtitled "Naming, Marking or Branding Containers, Receptacles, Equipment or Supplies."

Section 1 of said Chap. 2 reads in part as follows:

"Any person engaged in the transportation, manufacture, packing, canning, bottling or selling of any product or substance may adopt a name, mark, brand or device to be stamped, impressed or produced upon any can, bottle, cask, keg, barrel, receptacle, container, carrier or box, or upon any equipment or supplies, owned or used by him in the handling or transportation of such product or substance, or in his business. * * *."

Chapter 2, then, in the same and subsequent sections thereof, sets forth the manner in which such "name, mark, brand or device" may be adopted, prohibits the adoption by other persons of any name, etc., so adopted; and provides penalties for the unlawful use, or possession with intent to use unlawfully, by any person other than the owner thereof, of containers duly marked as in said title provided. Penalties are also provided for the defacement or removal of any such duly adopted mark, for trafficking in such marked containers "with intent to defraud the owner thereof, or without the written consent of the owner thereof, or unless the same shall have been purchased from the owner thereof," 95-2-8 and for other acts which are in some apparent, or purported, contravention of the objects sought by the statute.

This case is tendered to us upon the pleadings and upon certain stipulations of fact by the parties. It appears there-from that the plaintiff, Allen, is engaged in the business of selling milk and cream at a point in Davis County immediately north of the Salt Lake-Davis County boundary line; that the defendant, Lewis V. Trueman, is a duly elected, qualified and acting judge of the Second Judicial District

Court of the State of Utah; that the defendant, Joseph Holbrook, is the sheriff of Davis County, State of Utah and that the defendant, Calvin G. Roberts, is his deputy; and that the defendant, David F. Smith, is the Commissioner of Agriculture of the State of Utah, and the defendant, C. G. McCullough, is his deputy. It is to be noted in passing that the said act relating to trademarks and trade names entrusts certain duties with respect to the enforcement of the act to the Commissioner of Agriculture.

On the 26th day of July, 1939, when the status of the parties was as noted in the preceding paragraph, the defendant, McCullough, in purported pursuance of said Section 95-2-10, R. S. U. 1933, made an affidavit which, in substance, and among other things, set forth the following: That E. L. Allen was then engaged in the business of selling milk and cream at a place in Davis County, Utah, designated as the Allen Cream Station; that on the 13th day of July, 1939, in the performance of his duty as a deputy commissioner of agriculture, he had occasion to go to said place of business of said E. L. Allen; that at that time and place he found about 200 glass milk containers bearing various trademarks and trade names, which said trademarks and trade names were duly registered with the Secretary of State of Utah as provided by Title 95, R. S. U. 1933; that among other trademarks and trade names borne by said containers certain ones belonged to certain owners; (17 specific trade names are set out in the affidavit, together with the names of the asserted owners thereof, all of such owners appearing to be dairies.) that affiant had been advised by numerous persons who had purchased milk and cream from said E. L. Allen at his said place of business that containers in which milk and cream were delivered to them at particular times bore trademarks and trade names belonging to and registered in the names of persons other than the said E. L. Allen; that said glass containers had come into the possession of the said E. L. Allen without the consent of the owners; and that the said Allen retained possession of the same, and had indicated his inten-

tion of continuing to obtain registered trade-named milk containers and to use them in his business of selling milk and cream.

Upon the foregoing affidavit the defendant, Trueman, as District Judge, upon application of the defendant, McCullough, issued a search and seizure warrant which in substance directed "any peace officer in the County of Davis," in the daytime, to make immediate search of the premises of said E. L. Allen, as described in said affidavit, for re-fillable glass milk containers bearing any one of the trademarks or trade names specifically set forth in the warrant—such trade names corresponding to those set forth in the affidavit of the defendant, McCullough,—and, finding any, to seize and hold the same until further order of the court.

Thereafter, oh July 27, 1939, the defendant Roberts, deputy sheriff of Davis County, armed with said search and seizure warrant, went to plaintiff Allen's designated place of business in Davis County, searched it for glass milk containers bearing any of the trade names specified in said warrant, and upon such search found a total of 724 glass milk containers, all bearing one of the trade names as set forth in said warrant.

Upon the return of the warrant the court issued its warrant of attachment directing the defendant, Roberts, to safely keep the property seized by him pursuant to said warrant, and not relinquish it until discharged by due process of law. Whereupon, the court gave notice that all persons having or claiming any interest in any of the re-fillable glass milk containers taken and held pursuant to said warrant of search and seizure should file their claims thereto on or before the 19th day of August, 1939, the time set for hearing, "setting forth their interest in and to said property and the reasons, if any, why the possession of the same should not be delivered to them."

Following such notice claims were duly filed by each dairy whose trade name appeared upon any of the glass containers

seized by the defendant, Roberts, as shown by his return upon the search and seizure warrant.

It further appears from the pleadings that at no time was the plaintiff herein, E. L. Allen, arrested, or charged with any crime relating to the proceeding whatever, and that the defendants admit that said plaintiff claims an interest in the property referred to in the return of the search and seizure warrant and the notices given pursuant thereto.

The hearing upon the claims was not held on August 19th as set by the court, but was continued until the 21st day of October, 1939. In the meantime the said E. L. Allen filed his petition in this court praying that an alternative writ of prohibition issue directed to the District Court of the Second Judicial District and to the Honorable Lewis V. Trueman, as judge thereof, as well as to the other defendants herein, commanding them to refrain from further proceedings with respect to the matters hereinbefore related until further order of the court, and to show cause why they should not be permanently so restrained and prohibited. Hence arises the matter instantly before this court.

In *Allen* v. *Lindbeck*, 97 Utah 471, 93 P. 2d 920, we had before us the question of the constitutionality of said Section 95-2-10, R. S. U. 1933, as it was before its amendment by the Legislature of 1939. In that case we held the statute invalid for the reasons, primarily, that as then written Section 95-2-10 violated the constitutional prohibition against the issuance of search and seizure warrants except "upon probable cause supported by oath or affirmation," in that such statute required the issuance of such a warrant whenever any person should make an affidavit before the court upon information and belief, without requiring a statement of the facts showing the grounds of belief from which a finding of the constitutional "probable cause" could be made; and in that such statute manifested a legislative intent to transfer to the maker of the affidavit the duty of determining what constitutes probable cause for believing a person to

have unlawful possession of property, such determination being a judicial function which cannot be delegated.

As has been indicated Section 95-2-10 was amended by the 1939 legislature, so that it has since read as hereinbefore quoted. The evident purpose of the amendment was to overcome the unconstituionality affirmed by us in *Allen* v. *Lindbeck,* supra. In the case now before us the plaintiff, nevertheless, but not with great vigor, questions the constitutionality of the statute for the same reasons sustained by us in the aforesaid case.

As we view it, however, the said section of the statute, § 95-2-10, is not vulnerable in its present form to those objections. It is to be noted that that section as amended goes further than the mere filing of an affidavit based upon the information and belief of the affiant. It requires expressly that the affidavit shall also set forth "the facts upon which such belief is based." Furthermore, it provides as follows: "The court may thereupon examine on oath the complainant and any witnesses that may be produced or subpoenaed and take their depositions in writing. If it shall appear from the affidavit or from the affidavit and deposition or depositions that there is probable cause to believe that any such property is unlawfully possessed or secreted as aforesaid, the court shall issue a search and seizure warrant for such property." While such language does not explicitly require that the court shall make the requisite finding of probable cause before issuing its warrant, that intention is reasonably and fairly to be implied therefrom, especially when interpreted in the light of, and in conjunction with, the rule affirmed in *Allen* v. *Lindbeck,* supra, that the determination of what constitutes probable cause is essentially a judicial function. Since the statute, as just quoted, requires that "probable cause" shall appear from the affidavit, or from the affidavit and other evidence that may be taken by the court; and since it may properly be presumed that the legislature had full knowledge of our affirmations in said case of Allen v. Lindbeck when the amendment of

1939 was enacted, and that in so acting the legislature did not intend to violate the Constitution thereby rendering its amendment a nullity, it is apparent that the necessary implication is that a search and seizure warrant shall issue only when the court—not the affiant, nor any one apart from the court—shall have found that there is probable cause to believe that the property described is unlawfully in the possession of any person. *Lavagnino* v. *Uhlig*, 26 Utah 1, 71 P. 1046, 99 Am. St. Rep. 808; *Moss* v. *Taylor*, 73 Utah 277, 273 P. 515; 59 C. J. 1008 and 1038, 16 C. J. S., Constitutional Law, § 100, 278. We therefore hold that, in the respects indicated, § 95-2-10 does not violate any constitutional limitations as urged by plaintiff.

However, in the case before us, other questions of constitutionality are seriously urged. The plaintiff now attacks said Section 95-2-10, as amended in 1939, on several other grounds, among which are the following:

1. That said section violates the provisions of Section 14 of Article I, of the Constitution of this State, in that such a search and seizure as is therein provided constitutes an unreasonable search and seizure.

2. That said section denies to plaintiff the equal protection of the laws in violation of Section 1 of the Fourteenth Amendment to the Constitution of the United States.

3. That said section is unconstitutional in that it is not intended to, and does not, promote the public health, morals, safety or welfare, but amounts to special legislation in favor of a certain group or class of individuals in that it grants to them the right to use the criminal authorities of the State of Utah, and criminal procedure, in the recovery of personal property claimed by them, instead of leaving them to their usual civil remedies for the recovery of such property, in violation of Section 24, of Article I, and sub-section 16, of Section 26, of Article VI, of the Constitution of the State of Utah, which constitutional provisions relate respectively to the guarantee that all laws of a general nature shall have

uniform operation, and to the prohibition directed to the legislature forbidding it to grant to any individual, association or corporation any privilege, immunity or franchise.

Does the statute in question (said § 95-2-10) violate the constitutional inhibition against unreasonable searches and seizures? In order to answer that question it is necessary to inquire briefly into the character, purpose and function of search and seizure warrants generally, and into the reasons for the restraint imposed upon our legislature with regard to them by the constitutional inhibition relating to unreasonable searches and seizures. It is of primary significance that the right of the people to be secure from unreasonable searches and seizures is one of those fundamental rights guaranteed by the first ten amendments to the Constitution of the United States, and that a similar provision imposing a like restraint upon their several legislatures has been incorporated as a part of the constitutions of most of the states, including Utah. While it appears that the search warrant was not known to the early common law, its use gradually became engrafted thereon, until at and before the time of the adoption of the Constitution of the United States it had become a fixed and integral part thereof. The basic reason for this gradual adoption of the right by the state of the use of the search warrant was its efficiency, and later recognized necessity, as an adjunct to the criminal law in the apprehension of criminals and the suppression of crime. With the increase of the use of search warrants there arose also the temptation, and actual opportunity, for their use in the pursuit by the governments of ends which bore only remote relationships to the ends for which the law had originally justified their use. One of those abuses was the use by the English colonial government in America of the notorious general search warrants, or writs of assistance. It was the abuse of such warrants which lead the people of the colonies, in pursuit of their endeavor to protect persons in their right to be free from the arbitrary encroachments of government, to the adoption of the Fourth Amendment.

Since the purpose of the interdiction against unreasonable searches and seizures appears to be primarily the protection of the individual against oppressive invasion of his personal rights, it has long been recognized that the use of such warrants should be carefully limited and controlled to ■ attain the objects sought by the constitutional guaranties. Thus Judge Cooley in his "Constitutional Limitations" has said:

"Search warrants are a species of process exceedingly arbitrary in character and which ought not to be resorted to except for very urgent and satisfactory reasons."

Moreover, it has generally been recognized that the legitimate use of the search warrant is restricted to public prosecutions, and that in no event may such proceeding be invoked for the protection of any mere private right. It is a police weapon, and its use constitutes a valid exercise of the ■ police power, *State* v. *Guthrie,* 90 Me. 448, 38 A. 368; *People* v. *Wicka,* 117 Misc. 364, 192 N. Y. S. 633. Its primary use is to aid in the detection and punishment of crime, although its use in obtaining possession of contraband goods, e. g., intoxicating liquors, when they are made such, or gambling instruments, and in other ways directly promoting the public health, safety or moral welfare, is recognized.

Its use, however, to further the private interests of persons, in lieu of the remedies available to them, has not generally been condoned. Thus in *State* v. *Derry,* 171 Ind. 18, 85 N. E. 765, 768, 131 Am. St. Rep. 237, the court remarked:

"This statute is sustained under the federal Constitution, forbidding unreasonable search and seizure, only as a necessary means in the suppression of crime and the detection and punishment of criminals, and is required to be cautiously framed and strictly construed. Neither at common law, nor under the statute, is such process available to individuals in the course of civil proceedings, nor for the maintenance of any mere private right. It may only be invoked in the furtherance of public prosecutions."

And again, in *People* v. *Kempner*, 208 N. Y. 16, 101 N. E. 794, 797, 46 L. R. A., N. S., 970, Ann. Cas. 1914D, 169, the Court of Appeals of the State of New York, declared:

"Search warrants were never recognized by the common law as processes which might be availed of by individuals in the course of civil proceedings or for the maintenance of any mere private right; but their use was confined to cases of public prosecutions, instituted and pursued for the suppression of crime or the detection and punshment of criminals. * * *

"All searches, therefore, which are instituted and pursued upon the complaint or suggestion of one party into the house or possessions of another, in order to secure a personal advantage, and not with any design to afford aid in the administration of justice in reference to acts or offenses in violation of penal laws, must be held to be unreasonable, and consequently under our Constitution unwarrantable, illegal, and void."

To a like effect are the cases of *State* v. *District Court*, 70 Mont. 191, 224 P. 862; and *Briggs* v. *Shepard Manufacturing Co.*, 217 Mass. 446, 105 N. E. 622; and generally, 56 C. J. p. 1184, § 71.

In light of the foregoing let us examine briefly the satutes here under consideration. As has been indicated, Section 95-2-10, forms a part of Title 95 of our statutes. That title is "Trade-Marks And Trade Names," and is quite indicative of the purpose of the act. While it is true that statutes of similar general import may be upheld, and sometimes are, as a valid exercise of the police power it is also true that incidents to the enforcement of such acts such as the use of search warrants, must not violate fundamental constitutional guarantees, nor exceed legitimate exercise of the police power by having no real relation to the ends to be attained. *State* v. *Packer Corp.* 77 Utah 500, 297 P. 1013, 6 R. C. L. 242, 16 C. J. S., Constitutional Law, § 196, 565, 566. An examination of the statute before us discloses that it nowhere provides that articles trademarked or trade-named in accordance with its provisions shall be a representation of the

kind, quality, purity or fitness for human consumption, of the articles so marked, or of the contents of a container bearing such mark, or otherwise has for its object the protection of the public health or moral welfare. The primary, if not the only purpose of such act, if we except for the moment the object of Section 95-2-10 thereof, appears to be the protection and enhancement of the good-will connected with the business of the owner of the mark.

Referring particularly to Section 95-2-10, the part of the act which has to do with search warrants, we do not find that it bears any real relationship to any criminal proceeding under the act or otherwise, nor that it tends to promote any legitimate object of the police power. Before the amendment of said Section 95-2-10 it provided that when an officer seized any such marked receptacles he should also "bring before such court the person in whose possession such receptacle, container, carrier ,box, equipment or supplies may be found, and if it shall be adjudged that such person has been guilty of a violation of this chapter, the court shall award possession of such property to the owner thereof." In the section as amended no such provision appears, and proceedings thereunder may be entirely independent of any actual or intended criminal prosecution.

It is significant in this connection that in the action here sought to be prohibited the defendants herein admit that the plaintiff, E. L. Allen, was never arrested nor criminally charged with any crime whatsoever. We must conclude, therefore, that the intention of the legislature ■ as expressed in said Section 95-2-10 was to give to the owners of trademarks or trade names as provided in Title 95, the right to use an essentially criminal procedure for the attainment of their civil ends; that said section bears no actual relationship to the objects sought by the act in a proper exercise of the police power; that in view of Section 14, of Article I, of the Constitution of Utah, the search and seizure provided therein is unreasonable, and that said Sec. 95-2-10 is therefore void.

The conclusion just reached is in itself perhaps sufficient for a complete determination of this proceeding. Nevertheless, plaintiff strongly urges, among other things, that said statute denies to plaintiff the equal protection of the law; that it violates our guarantee of uniform operation of the laws, and that it violates the provision of our state constitution forbidding the legislature to enact special laws granting special privileges, and since many of the cases, e. g., *Yaeger* v. *State,* 78 Fla. 354, 83 So. 525, hold statutes relating to search and seizure to be invalid upon a concurrence of several such constitutional grounds without specifying any one in particular, and might support either the conclusion as to unreasonable searches or as to class legislation, we shall consider some of those contentions.

A close persual of said Section 95-2-10 reveals that it in manifest effect grants a special privilege to a special group or class of persons, i. e., to those who are owners of trademarks or trade names adopted by virtue of said Title 95. That privilege consists in the right through the search and seizure process therein provided to use courts and law enforcement officers for the recovery of what they assert to be their property. It does not, for instance, permit the plaintiff herein, who has no duly adopted trademark or tradename for use upon his milk bottles, to use the same procedure for the recovery of his milk bottles as is, in the action herein sought to be prohibited, invoked against him; and this notwithstanding that he is engaged in the dairy business as are his co-defendants, the several dairies who made claim to some of the seized milk bottles, in the court below. Such discrimination may not be justified within the purview and objects of the police power; and, as we have already pointed out, it does not come within that purview because there is no essential relation between it and the public health, morals, or welfare.

Moreover, the statute, Section 95-2-10, provides specifically for the transfer in writing of any trademark or tradename, and the receptacles distinguished by them, upon any

terms, so far as the public is concerned, that the owners thereof desire. Such transfer must, as a condition precedent to the passing of the title, be filed with the Secretary of State, thereby again manifesting an object to make the ownership of the receptacles a matter of public notice, and to limit proof thereof to the public record, for the benefit of those particular persons who own registered trademarks or trade-names.

The conclusion is, therefore, inescapable that said Section 95-2-10 is in violation of the constitutional guarantees against the granting of special privileges and providing for uniform operation of the laws.

Among other cases which support this conclusion are *Yeager* v. *State,* 78 Fla. 354, 83 So. 525; *Lippman* v. *People,* 175 Ill. 101, 51 N. E. 872; *Horwich* v. *Walker-Gordon Laboratory Co.,* 205 Ill. 497, 68 N. E. 938, 98 Am. St. Rep. 254; *State* v. *Schmuck,* 77 Ohio St. 438, 83 N. E. 797, 14 L. R. A., N. S., 1128, 122 Am. St. Rep. 527, and *State* v. *Wiggam,* 187 Ind. 159, 118 N. E. 684.

Thus in *Lippman* v. *People,* supra [175 Ill. 101, 51 N. E. 873], wherein the Supreme Court of Illinois declared unconstitutional an act to protect bottlers and dealers in beer, mineral water, etc., from the loss of their trademark bottles, by the use of the remedy of search and seizure, the court said:

"It confers upon them [owners of the brand] the power to call upon the state and its officers and judiciary to act as collectors of their bottles, kegs, and boxes which they have voluntarily scattered over the state among their customers. It attempts to place at their disposal the extraordinary right of the search warrant, by which they may arm a constable or other officer with process to intrude upon the premises or the home of any citizen to recover their bottles, kegs, and the like. * * * It seems that the peculiar benefits, advantages, and rights conferred by this act upon the persons named in it, and the right to employ an unusual remedy for the recovery of their property, must be classed as privileges * * *."

After the decision in the above case the Illinois legislature amended the statute in question in an effort to obviate the

defects discovered therein. In *Horwich* v. *Walker-Gordon Laboratory Co.*, supra [205 Ill. 497, 68 N. E. 940, 98 Am. St. Rep. 254], the Illinois court had before it the statute as amended. After disposing, adversely, of a contention that the law should be sustained under the police power of the state, the court observed:

"A patient consideration of the provisions of this statute leads us to the conclusion that its purpose, like that of the earlier statute, was to facilitate the recovery of certain kinds of personal property, to wit, the receptacles described in the first section of this statute, which have passed from the possession of the owners thereof to others, and which the owners desire to recover summarily. The act is wholly for the benefit of the owners of personal property of this class, and is designed to give to the owners of personal property of this class rights and privileges not possessed by the owners of other classes of personal property."

Again, in *State* v. *Schmuck*, supra [77 Ohio St. 438, 83 N. E. 800, 14 L. R. A., N. S., 1128, 122 Am. St. Rep. 527], the Supreme Court of Ohio had before it a trade-name law containing a search and seizure provision substantially similar to our own. In holding that law unconstitutional, particularly under the "special privilege" clauses of the state constitution, the court remarked:

*"It is difficult to conceive of a clearer case of class legislation in favor of certain dealers who have the ordinary means of reclaiming their property available to other citizens, plus the criminal procedure of the state to not only reclaim but to punish."* (Italics added.)

Counsel for defendants, who also, in the court below, represented the several dairies who filed claims to the seized milk containers, present arguments as to the wisdom and desirability of such a law as is here before us from the point of view of the interested dairies, and also, so they contend, from the point of view of the general public. In disposing of those contentions we need only remark that we are here not primarily concerned with the wisdom, desirability or expediencey of the law, but with the

question as to whether it violates constitutional guaranties. 16 C. J. S., Constitutional Law, § 92 et seq., 201 et seq. Those former considerations are properly addressed to the legislature, which within the limits set down by our state and federal constitutions, has plenary power to enact such laws as it sees fit.

Counsel for defendants also call our attention to our duty when we are confronted with a question involving the constitutionality of a statute. In that connection they ■ quote particularly, *Lehi City* v. *Meiling*, 87 Utah 237, 48 P. 2d 530, 535. In the course of the decision in that case we declared:

"In approaching the subject we have in mind the rule that when an act of the Legislature is attacked on grounds of unconstitutionality the question presented is not whether it is possible to condemn the act, but whether it is possible to uphold it. The presumption is always in favor of validity, and legislative enactments must be sustained unless clearly in violation of fundamental law."

We note this contention particularly, and had it in mind in reaching the conclusion that said Section 95-2-10 is unconstitutional for the reasons herein stated. In that connection we are not, nevertheless, unmindful of our duty to guard the fundamental rights, privileges and immunities of persons guaranteed by our Constitution, generally, and the guaranty of immunity from unreasonable searches and seizures, particularly, against any kind of legally unjustified encroachment.

Counsel for defendants invite us, too, via an article by Professor Thomas Reed Powell, which appears in the Harvard Law Review, Vol. LIII, pp. 529, 530, to view the law here under consideration in the light of a Constitution that in recent years "has been rapidly changing its ■ face." They suggest that the milk industry has many of the characteristics of many service industries which for a long time have been denominated "public utilities," and which by virtue of such classification have exercised privi-

leges and prerogatives not extended to purely private enterprises. So far as this case is concerned it is probably sufficient to point out that the statute here under consideration does not refer only to the milk industry, but comprehends all industries and businesses wherein the proprietors consider it advantageous to adopt trademarks or trade names to distinguish their goods or containers. Milk bottles are not mentioned specifically anywhere in the act; a trademark or trade-name may be adopted by any person "engaged in the transportation, manufacture, packing, canning, bottling or selling of any product or substance," § 95-2-1 and may be used upon the can, bottle, cask, keg, barrel, receptacle, container, carrier, box, equipment or supplies, used in the business of the person filing such claim." § 95-2-2. § 95-2-10, with which we are most particularly concerned, does not even mention "bottles," but uses the more general terms, "receptacle, container, etc." In passing upon the questions of constitutionality here raised we are concerned not so much with what was done under the act under the facts as presented by this case, as with what it authorized to be done, if we hold the statute a proper exercise of the legislative power. 16 C. J. S., Constitutional Law, § 97, 229; *Allen* v. *Lindbeck,* supra. We do not, therefore, consider the act only as it applies to the milk industry.

For the rest, counsel for defendants argue at some length the proposition that the use of a rival's container for the sale of a competing product, where the effect of such use is to pass off the user's product as the product of the original user of the container, is unfair competition, and warrants the issuance of an injunction against such use. In support of that contention we are referred to an annotation, following *Clover Leaf Dairy* v. *Van Gerven,* 72 Utah 290, 269 P. 1020, a case decided by this court, which appears at 60 A. L. R. 285. In that connection it must be remembered that this is a proceeding to enjoin the defendants from proceeding further under Section 95-2-10 of the statute, which deals with the use of the search and seizure warrant and the restoration to

the owners of property seized by virtue thereof, and that the attack of the plaintiff upon constitutional grounds is directed against the procedure provided in said section 95-2-10. For these reasons, and in view of the conclusions already reached in the course of this decision, the cases cited by defendants in support of that proposition are beside the point.

Counsel for defendants cite us to no case that sustains the procedure by search and seizure provided by the statute under consideration. They do cite cases wherein trademark statutes involving the use of glass milk containers have been upheld as to their constitutionality. Among these are *Associated Dairies of Wichita* v. *Fletcher,* 143 Kan. 561, 56 P. 2d 106; *Wichita National Milk Dealers* v. *Capp,* 144 Kan. 238, 59 P. 2d 29; *Denver Milk Bottle Case, etc.* v. *McKinzie,* 87 Colo. 379, 287 P. 868; and *Pacific Coast Dairy* v. *Police Court,* 214 Cal. 668, 8 P. 2d 140, 141, 80 A. L. R. 1217. It is significant, however, that in none of those cases was any kind of search and seizure procedure involved. Thus, in *Pacific Coast Dairy* v. *Police Court,* supra, the Supreme Court of California had under consideration a particular section of that state's "General Dairy Law" which made it the duty of every person finding or receiving any container marked with a registered brand to make diligent effort to find the owner thereof and to restore the same to him. The defendant was charged in the police court of San Francisco with a violation of that section, and brought prohibition to restrain that court from proceeding under such charge, on the ground, principally, that the section of said General Dairy Law, above-paraphrased, offended the state constitution in certain particulars. The Supreme Court affirmed that it did not. In the course of reaching that conclusion the court referred to a previous decision by it, *Bartolloti* v. *Police Court,* 35 Cal. App. 372, 170 P. 161, and it is to be here noted that in the latter case the California court remarked particularly that it did not therein have before it the question of the invasion of the personal rights of the petitioner as affected by the search and seizure proceeding provided by

the statute there in question. It is significant, furthermore, that in *Pacific Coast Dairy* v. *Police Court,* supra, that court was not asked to sustain any search and seizure provision.

Moreover, in that case, the California court refers, in support of its opinion therein, to *Renner Brewing Co.* v. *Rolland,* 96 Ohio St. 432, 118 N. E. 118. In that case the Ohio court had before it the same general statute as in *State* v. *Schmuck,* supra, but it is to be particularly noted that that statute then had eliminated from it, by amendment subsequent to *State* v. *Schmuck,* all provisions for the issuance of a warrant to search premises and to seize property. With such elimination the constitutionality of the statute was sustained.

The constitutionality of Section 95-2-10 is assailed on certain other grounds by plaintiff, but in view of the conclusions already reached herein we deem a discussion of them superfluous. Said section of the statute for the reasons herein stated is clearly violative of Sections 14 and 24, Article I, and subsection 16, section 26, of Article VI, of the Constitution of this state, as well as Section I of the Fourteenth Amendment to the Constitution of the United Sates.

It follows that the alternative writ of prohibition therefore issued in this case should be made permanent, and the defendants are ordered to make restitution to the plaintiff of the property seized. Such is the order.

LARSON, McDONOUGH, and PRATT, JJ., concur.

WOLFE, Justice (concurring).

I concur.

I call attention to the further fact not mentioned in the opinion that the courts will exercise stricter scrutiny over measures which encroach on civil liberties than those which affect economic situations in determining whether the legislature has constitutionally exercised its judgment. This could hardly be better expressed than in the footnote in Law and Politics, a collection of occasional papers by Mr. Justice Frankfurter, page 97.

"Friendly critics have suggested that Cardozo viewed encroachments upon civil liberties with less deference to the legislative judgment than that which he accorded to economic measures. The same seeming inconsistency has been suggested against Holmes and the answer made in Holmes' case applies to Cardozo as well:

" 'The Justice deferred so abundantly to legislative judgment on economic policy because he was profoundly aware of the extent to which social arrangements are conditioned by time and circumstances, and of how fragile, in scientific proof, is the ultimate validity of a particular economic adjustment. He knew that there was no authoritative fund of social wisdom to be drawn upon for answers to the perplexities which vast new material resources had brought. And so he was hesitant to oppose his own opinion to the economic views of the legislature. But history had also taught him that, since social development is a process of trial and error, the fullest possible opportunity for the free play of the human mind was an indispensable prerequisite. Since the history of civilization is in considerable measure the displacement of error which once held sway as official truth by beliefs which in turn have yielded to other truths, the liberty of man to search for truth was of a different order than some economic dogma defined as a sacred right because the temporal nature of its origin had been forgotten. And without freedom of expression, liberty of thought is a mockery. Nor can truth be pursued in an atmosphere hostile to the endeavor or under dangers which only heroes hazard.

" 'Naturally, therefore, Mr. Justice Holmes attributed very different legal significance to those liberties of the individual which history has attested as the indispensable conditions of a free society from that which he attached to liberties which derived merely from shifting economic arrangements. * * * Because these civil liberties were explicitly safeguarded in the Constitution or conceived to be basic to any notion of the liberty guaranteed by the Fourteenth Amendment, Mr. Justice Holmes was far more ready to find legislative invasion in this field than in the area of debatable economic reform.' " Frankfurter, Mr. Justice Holmes and the Supreme Court (1938), 50, 51.

---

The right to be free from unreasonable searches and seizures is a civil right. To use the power of search and seizure for the convenience of discovering and recovering for certain groups engaged in business is not a public purpose, however it may be disguised. I assume that the opinion does not intend to go to the extent of holding that there

might not be power in the legislature to give the right to search and seizure of containers actually being used for the spurious purpose of palming off a product of A's as that of B by using B's trademarked containers where such was prohibited out of consideration of public welfare.

MOFFAT, C. J., being disqualified, did not participate herein.