2002 UT 134

**Marie WOOD and Terry Borman individually and as the natural parents of Mary Lorraine Wood Borman, a minor, Plaintiffs and Appellants,**

v.

**UNIVERSITY OF UTAH MEDICAL CENTER, Defendant and Appellee.**

No. 20000827.

Supreme Court of Utah.

Dec. 31, 2002.

Rehearing Denied April 14, 2003.

Thomas A. Schaffer, J. David Pearce, Salt Lake City, for plaintiffs.

David G. Williams, Rodney R. Parker, Salt Lake City, for defendant.

WILKINS, Justice:

¶ 1 The instant appeal requires us to determine the constitutionality of the Utah Wrongful Life Act, Utah Code Ann. §§ 78–11–23 to –25 (2002), legislation prohibiting a cause of action "based on the claim that but for the act or omission of another, a person would not have been permitted to have been born alive but would have been aborted." Utah Code Ann. § 78–11–24 (2002). Plaintiffs insist the statute violates the Open Courts Clause, article I, section 11 of the Utah Constitution, the Due Process guarantees of the United States and Utah Constitutions, and the Equal Protection guarantees of the United States and Utah Constitutions. Plaintiffs claim the district court erred in upholding the Utah Wrongful Life Act as constitutional and in dismissing plaintiffs' complaint for wrongful birth as barred by the Act. We are also asked to decide whether plaintiffs' claims for negligent infliction of emotional distress and failure to obtain informed consent were appropriately dismissed as barred by the Act because they necessarily require proof that plaintiffs would have aborted the child. We affirm the decision of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 When determining whether a trial court properly dismissed a complaint, we accept the factual allegations in the complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. See *Krouse v. Bower*, 2001 UT 28, ¶ 2, 20 P.3d 895. We recite the facts accordingly.

¶ 3 This case arose from treatment and advice that plaintiffs Marie Wood and Terry Borman received from the University of Utah Medical Center related to Marie's pregnancy. When Marie became pregnant, she and her husband, Terry, sought genetic counseling from the University of Utah Medical Center ("Medical Center"). They specifically sought advice about the risk that Marie, because of her age, would give birth to a child with a genetic disorder. Doctors at the Medical Center performed some tests in January 1998, the results of which plaintiffs claim they were never informed. Further testing was performed in February and March 1998. An initial February test was unsuccessful, so plaintiffs opted for a repeat test later in the month. A second February test was performed, followed by further testing in March. Plaintiffs claim they were again not informed of the results of a March test. They were, however, informed in late March that the tests indicated an 85% probability that Marie's would-be child would be born with Down syndrome. Nevertheless, doctors told plaintiffs not to worry because the tests often resulted in false positives and led plaintiffs to believe that the chances Marie's child would have Down syndrome were actually quite small. Based on this advice, plaintiffs decided to proceed with delivery. In August 1998, Marie delivered a baby girl, Mary Lorraine, who was diagnosed with Down syndrome.

¶ 4 Plaintiffs filed suit in the district court alleging that the doctors and other health care professionals employed at the Medical Center were negligent because they misread the tests, and failed to inform plaintiffs of certain test results; specifically, the likelihood that Marie would deliver a child with Down syndrome. Plaintiffs raised three causes of action: (1) Negligence in performing and interpreting various tests and for failing to provide plaintiffs with sufficient information to make an informed decision whether to abort, resulting in the birth of Mary, a child with Down syndrome. In raising this claim plaintiffs maintain that because of this negligence, they incurred the cost of labor and delivery, they are incurring unwanted medical and other expenses related to Mary's care, they will be "unable to live

ordinary lives due to the increased attention Mary Lorraine will require," they suffer mental anguish and pain and suffering, and Mary was "wrongfully born afflicted with Down Syndrome, and will suffer the effects of that syndrome for the remainder of her natural life." (2) Negligent infliction of emotional distress. In raising this claim plaintiffs "re-aver[ed] all allegations previously stated" and claimed "they will continue to incur pain and suffering and mental anguish for the remainder of their natural lives" because of the Medical Center's negligence. (3) Failure to obtain informed consent. In raising this claim plaintiffs again "re-aver[ed] all allegations previously stated." Plaintiffs also specifically insisted that "[a] reasonable, prudent person or persons in Plaintiffs' position would not have consented to the health care rendered after having been fully informed as to all facts relevant to the decision to give consent." Plaintiffs further claimed they were "denied the opportunity to make an informed decision as to the medical care they would receive, and as to the continuation of the pregnancy," and, as a result, suffer "mental anguish and distress, loss of consortium, costs associated with labor and delivery, extraordinary medical and other related expenses, and the right to lead a normal life." Couched as a fourth cause of action, plaintiffs asserted that section 78–11–24 of the Utah Code is unconstitutional.

¶ 5 The Medical Center filed a motion for judgment on the pleadings, pursuant to Utah Rule of Civil Procedure 12(c), alleging that plaintiffs' claims were barred by sections 78–11–23 and –24 of the Utah Code, two provisions of the Utah Wrongful Life Act. Plaintiffs opposed the motion and filed a cross-motion for partial summary judgment, asserting that section 78–11–24 is unconstitutional. The district court held that section 78–11–24 was constitutional and barred all of plaintiffs' claims, therefore granting defendant's motion for judgment on the pleadings and denying plaintiffs' motion for partial summary judgment.

¶ 6 Plaintiffs appeal, challenging section 78–11–24 as violative of the Open Courts Clause of the Utah Constitution, the Due Process Clauses of the Utah and United States Constitutions, and the equal protection guarantees of the Utah and United States Constitutions. Plaintiffs also claim the district court erred in dismissing their claims for negligent infliction of emotional distress and failure to obtain informed consent.

## ANALYSIS

### I. OPEN COURTS CLAUSE

#### A. Standard of Review

¶ 7 "The issue of '[w]hether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court.' " *Grand County v. Emery County,* 2002 UT 57, ¶ 6, 52 P.3d 1148 (quoting *State v. Daniels,* 2002 UT 2, ¶ 30, 40 P.3d 611). Furthermore, we presume the legislation being challenged is constitutional, and we resolve any reasonable doubts in favor of constitutionality. *Id.; see also Utah Sch. Bds. Ass'n v. State Bd. of Educ.,* 2001 UT 2, ¶ 9, 17 P.3d 1125. As this court stated in a prior Open Courts case:

> The first and foundational [principle of law relating to the constitutionality of statutes] is that the prerogative of the legislature as the creators of the law is to be respected. Consequently, its enactments are accorded a presumption of validity; and the courts do not strike down a legislative act unless the interests of justice in the particular case before it require doing so because the act is clearly in conflict with the higher law as set forth in the Constitution.

*Zamora v. Draper,* 635 P.2d 78, 80 (Utah 1981) (internal citations omitted); *see also Soc'y of Separationists, Inc. v. Whitehead,* 870 P.2d 916, 920 (Utah 1993); *Lindon City v. Engineers Const. Co.,* 636 P.2d 1070, 1073 (Utah 1981).

¶ 8 We recognize that on previous occasions involving Open Courts challenges this court recognized an exception to our well-settled presumption-of-constitutionality standard. *See Hipwell v. Sharp,* 858 P.2d 987, 988 n. 4 (Utah 1993); *Condemarin v. Univ. Hosp.,* 775 P.2d 348, 368 (Utah 1989) (Zimmerman, J., concurring); *see also Currier v. Holden,* 862 P.2d 1357, 1362–63 (Utah Ct. App.1993). We submit that this heightened

standard of review for Open Courts challenges was in error. Any heightened level of scrutiny simply because the constitutional challenge is based on the Open Courts Clause is improper. We recognize that returning to the established standard of review is contrary to the relatively recent above-cited decisions. However, "[t]his court has 'not hesitated . . . to reverse case law when we are firmly convinced that we have erred earlier.' " *Clark v. Clark,* 2001 UT 44, ¶ 32 n. 3, 27 P.3d 538 (quoting *Staker v. Ainsworth,* 785 P.2d 417, 424 n. 5 (Utah 1990)) (Russon, A.C.J., dissenting, joined by Howe, C.J.). We are firmly convinced that this court erred earlier, and, as a result, we would review challenges to legislation based on the Open Courts Clause for correctness, resolving any reasonable doubts in favor of constitutionality, just as in all other such cases.

### B. Berry Analysis

 ¶ 9 The Open Courts Clause analysis is controlled by *Laney v. Fairview City,* 2002 UT 79, 57 P.3d 1007, this court's recent interpretation of the Open Courts Clause, upholding *Berry ex rel. Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985).[1] The challenged legislation, section 78–11–24 of the Utah Code, was enacted in 1983 and reads as follows:

> A cause of action shall not arise, and damages shall not be awarded, on behalf of any person, based on the claim that but for the act or omission of another, a person would not have been permitted to have been born alive but would have been aborted.

Utah Code Ann. § 78–11–24 (2002). Plaintiffs first claim that the statute violates the Open Courts Clause. In order for a statute to withstand a constitutional challenge under the Open Courts Clause, *Berry* requires one of two conditions to be met:

> First, . . . the law [must otherwise provide] an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different . . . [; or]
>
> [s]econd, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Berry,* 717 P.2d at 680 (citations omitted).

¶ 10 Plaintiffs argue that the statute violates the Open Courts Clause because it abrogates a legal remedy (1) without providing an alternative remedy and (2) without eliminating a clear social or economic evil. First, plaintiffs insist that the statute abrogates a legal remedy without providing an alternative remedy. Plaintiffs assert that their claim for professional negligence, cognizable before the legislation was enacted, has been eliminated without providing any remedy, let alone one that is "substantially equal in value or other benefit." *Id.* Plaintiffs further assert that Utah has always recognized a remedy for medical malpractice, particularly in 1983 when the statute was enacted, the time critical to the *Berry* analysis. They contend the Medical Center owed them a duty of professional care, which it breached, depriving plaintiffs of the opportunity to make an informed choice. In other words, according to plaintiffs, their claim is simply a negligence claim, and because of the legislation, their claim that would have been valid prior to the statute is now no longer available. Second, plaintiffs argue that because there is

---

1. The author and Associate Chief Justice Durrant disagree with the current Open Courts analytical framework, and are still firmly convinced that the decision in *Laney* to adhere to the *Berry* interpretation and test was erroneous. *See Laney,* 2002 UT 79 at ¶¶ 84–139, 57 P.3d 1007, (Wilkins, J., dissenting). Nevertheless, *Laney* is controlling precedent from this court, and we are cognizant of and respect the principle of stare decisis which gives stability and predictability to our legal system. *See Clark,* 2001 UT 44 at ¶¶ 25–29, 27 P.3d 538, (Wilkins, J., concurring). On that basis, we apply the *Berry* test to the instant case to reach the decision of this court, that the challenged legislation is constitutional.

no effective and reasonable alternative remedy, the legislation must satisfy the second *Berry* query, which it does not. "[I]f there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." *Id.* (citations omitted). According to plaintiffs, the statute does not eliminate a clear social or economic evil. They declare that abortion cannot be a clear social evil because a woman has a constitutional right to terminate a pregnancy. Additionally, they claim, the Medical Center has not shown that the evil they suggest was eliminated, the stigmatization of unwanted children, was the evil the legislature intended to eliminate. Moreover, according to plaintiffs, the statute is arbitrary and unreasonable in attempting to achieve its objectives. Plaintiffs insist the avowed legislative objective veils the statute's underlying objectives, which include permitting doctors to refuse to perform abortions and an intent to reduce genetic testing. The essence of the problem for plaintiffs is that, in their view, the statute does away with a remedy that existed prior to the statute's enactment, effectively insulating doctors from professional liability under circumstances such as these, and in abolishing this remedy, the legislature did not eliminate a clear social or economic evil, much less do so through a non-arbitrary, reasonable statute that is narrowly tailored to advance its avowed purpose.

¶ 11 The Medical Center counters that the statute does not violate the Open Courts Clause for two reasons. First, the statute does not abrogate an existing legal remedy. The Medical Center insists a wrongful birth claim is not simply a medical malpractice claim and that there was no existing cause of action for wrongful birth in 1983 when section 78–11–24 was enacted. Second, it proposes that, assuming the statute does abrogate an existing legal remedy without providing an effective and reasonable alternative remedy, there is a clear social or economic evil to be eliminated, namely the stigmatization of disabled and unwanted children, and the statute is not an arbitrary or unreasonable means for achieving this objective. Thus, the statute is a constitutional exercise of legislative power.

¶ 12 We turn to the initial *Berry* query: Whether the statute provides an effective and reasonable alternative remedy, substantially equal in value or other benefit to the abrogated legal remedy. *Berry,* 717 P.2d at 680. Inherent in this question, however, is whether the statute abrogated an existing remedy or cause of action. *See Cruz v. Wright,* 765 P.2d 869, 870–71 (Utah 1988). We agree with defendant that the statute did not abolish an existing legal claim or remedy because Utah did not recognize a right to sue for wrongful birth in 1983.

¶ 13 As required under *Day v. State,* we consider whether the statute abolished a legal remedy that existed at the time of enactment, not whether the statute abolished a legal remedy that existed at the time of statehood. 1999 UT 46, ¶¶ 36–38, 980 P.2d 1171. We disagree with the plaintiffs' argument that the statute abolished the right to claim negligence against a physician who gives erroneous medical advice to a mother who, based on that erroneous advice, decides to proceed with pregnancy and then delivers a child with a disability. It is true that health care professionals are essentially insulated from certain professional malpractice claims; but, the fact remains that, under our *Berry* test, the statute did not abolish an existing legal claim or remedy because Utah did not recognize a right to sue for wrongful birth in 1983.

¶ 14 We note at the outset that "[a]t common law, no cause of action existed for either wrongful birth or wrongful death." *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 13 (Minn.1986) (citing *Baker v. Bolton,* 170 Eng. Rep. 1033 (N.P.1808), and W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* §§ 55, 125A (5th ed.1984)). More importantly, though, this court has never recognized the tort of wrongful birth in Utah. In *Payne ex rel. Payne v. Myers,* this court was presented with a wrongful birth claim, but decided the appeal without determining whether a cause of action for wrong-

ful birth existed in Utah. The court stated, "[a]ssuming, but not deciding, that Utah jurisprudence should recognize an action for wrongful birth, it is necessary to determine when the parents' cause of action accrued." 743 P.2d 186, 188–89 (Utah 1987) (footnote omitted). The court then held that plaintiffs' hypothetical claim for wrongful birth was barred in any event by governmental immunity because plaintiffs did not file a notice of claim within one year of when the alleged injury accrued. *Id.* at 189–90. The following year, in *C.S. v. Nielson,* 767 P.2d 504 (Utah 1988), this court again decided an appeal involving a claim for wrongful birth without deciding whether such a tort was recognized in Utah. *See id.* at 506. The court distinguished claims for wrongful life, wrongful pregnancy, and wrongful conception from a claim of wrongful birth,[2] but then went on to expressly note that *Nielson* "is correctly viewed as involving a wrongful pregnancy cause of action." *Id.* In both *Nielson* and *Payne,* the court noted that other states that had considered wrongful birth claims were almost unanimous in their recognition of a cause of action where it was alleged that but for negligence, the parents would have terminated a congenitally or genetically defective fetus by abortion. *Nielson,* 767 P.2d at 506 n. 4 (citing *Siemieniec v. Lutheran Gen. Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691, 696 (1987)); *Payne,* 743 P.2d at 188–89 n. 5. Neither *Nielson* or *Payne* recognized, however, the existence of a cause of action for wrongful birth in Utah. At best, it was unclear whether such a cause of action might have been recognized by this court prior to 1983, if it had decided the issue. The fact remains, though, that no such decision was made, and consequently the tort of wrongful birth did not exist in Utah in 1983. In the absence of a declaration by this court either recognizing, or refusing to recognize, a cause of action for wrongful birth, the legislature set forth the law, declaring that claims for wrongful birth would not be recognized in Utah in enacting section 78–11–24. As a result, regardless of whether such an action was recognized by other states at the time, because a cause of action for wrongful birth did not exist in Utah at the time the statute was enacted in 1983, the legislature did not abrogate an existing legal remedy.

¶ 15 In sum, because the statute did not abrogate an existing legal remedy, and because the *Berry* test begins with the presumption that a legal remedy was abolished, the legislation satisfies the first *Berry* hurdle. Because we conclude that no existing remedy was abrogated, we need not apply the second part of the *Berry* test.[3] As was the case in *Cruz v. Wright,* "in the present case, in contrast to *Berry,* the statute in question did not operate either to extinguish a cause of action after it had accrued or to limit the remedies available; it simply prevented one from ever arising." 765 P.2d 869, 871 (Utah 1988). We therefore hold that the legislation in question was a constitutional exercise of legislative authority that did not violate the Open Courts Clause.

**2.** This court defined wrongful birth as a "cause of action whereby parents claim they would have avoided conception or terminated an existing pregnancy by abortion but for the negligence of those charged with, among other things, prenatal testing or counseling as to the likelihood of giving birth to a physically or mentally impaired child." *Nielson,* 767 P.2d at 506; *see also Payne,* 743 P.2d at 187 n. 1. This is what plaintiffs have claimed in this case.

**3.** In *Laney,* I stated that "other cases may, and certainly will, more clearly reveal reasonable positions on either side of the *Berry* framework...." 2002 UT 79 at ¶ 92, 57 P.3d 1007. To me, this case reveals an inherent problem with the *Berry* test, that it "simply sets forth a framework for justifying the policy position of a majority of the members of this court." *Id.* The second *Berry* query is as follows: If there is no substitute or alternative remedy provided, does the statute remedy a clear social or economic evil; and is the statute, the means for achieving the objective, a non-arbitrary or reasonable means for eliminating the clear social or economic evil? To me, the positions of both plaintiffs and defendant on this point are not unreasonable. Plaintiffs' contention has merit: The right to abort a fetus is a constitutional right and therefore cannot be a clear social evil. The defendant's argument also has merit: destroying a life or potential life because it is likely to be disabled is a clear social evil. In my view, the fact that both positions are reasonable reveals the disguise of the *Berry* test, that it functions as a vehicle for judicial legislation, permitting—even requiring—this court to substitute its judgment on what constitutes good public policy for the policy judgment of the legislature, the representatives of the public.

## II. DUE PROCESS

¶ 16 Plaintiffs insist the statute violates the Due Process Clauses of the United States and Utah Constitutions. They claim that, despite the statement of legislative purpose that "it is the public policy of [Utah] to encourage all persons to respect the right to life of all other persons, regardless of age, development, condition or dependency, including all handicapped persons and all unborn persons," [4] Utah Code Ann. § 78–11–23 (1996), the purpose and effect of the statute is to unduly burden a fundamental constitutional right—the right of a woman to abort an unviable fetus. Plaintiffs argue that the statute, in effect, eliminates informed choice, and informed choice is central to the right to terminate a pregnancy. The Medical Center counters that the statute does not violate either the United States or Utah Due Process Clauses.[5] The Medical Center argues that the purpose of the statute is not to prevent abortions, but indeed to "encourage people to respect the right to life of all other persons, ... including all persons with a disability and all unborn persons." Defendant claims plaintiffs' alleged sources of legislative history are not valid sources, but statements of the drafter and some legislators in non-legislative settings. The Medical Center asserts that the statute does not have the effect of unduly burdening the right of a woman to choose to abort her would-be child. According to the Medical Center, in order to be unconstitutional under the Due Process Clause, the statute must impose a significant burden on, or place a substantial obstacle in the path of a woman seeking to abort an unviable fetus; and this statute does not unduly burden this fundamental right.

### A. Federal Due Process

¶ 17 In *Planned Parenthood v. Casey*, the Supreme Court upheld the essential holding of *Roe v. Wade*, that a woman has the right to terminate her pregnancy before viability. *Casey*, 505 U.S. 833, 870–71, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Stenberg v. Carhart*, 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In *Casey*, balancing the state's interest in fetal life and the right of a woman to decide to abort a nonviable fetus, the Court further held that this right of a woman to abort an unviable fetus cannot be unduly burdened by the state; a state regulation cannot have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. 2791; *Stenberg*, 530 U.S. at 921, 120 S.Ct. 2597 (quoting *Casey*, 505 U.S. at 877, 112 S.Ct. 2791). Thus, current federal substantive due process requires us to decide whether section 78–11–24 prohibiting lawsuits for wrongful birth—claims "that but for the act or omission of another, a person would not have been permitted to have been born alive but would have been aborted"—"has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. In our view, the statute does not, either on its face or in its effect, place an undue burden on a woman's ability to abort an unviable fetus.

¶ 18 First, the statute is not unconstitutional on its face. By prohibiting causes of action based upon the assertion that but for the negligence of another, a fetus would have been aborted, the statute does not, on its face, place a substantial obstacle in the path of a woman seeking an abortion. The statute's purpose is not to unduly burden the ability of a woman to abort an unviable fetus, but to prevent lawsuits for wrongful birth and thereby "encourage all persons to respect the right to life of all other persons." Utah Code Ann. § 78–11–23 (1996).

¶ 19 Plaintiffs' contention that the statute's legislative history evidences that the statute's purpose is to prevent or hinder

---

4. The language "all handicapped persons" was changed in 2001 to read "all persons with a disability." *See* Utah Code Ann. § 78–11–23 (2002).

5. Defendant initially claims there is no state action. This is clearly not the case, however, as the

passage of the legislation and subsequent application of it by the district court constitutes obvious action by the state government for purposes of Fourteenth Amendment analysis. *See Shelley v. Kraemer*, 334 U.S. 1, 14, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

abortions is unavailing as we need not examine the legislative history of this statute to discover the legislative intent. "When examining a statute, we look first to its plain language as the best indicator of the legislature's intent and purpose in passing the statute." *Wilson v. Valley Mental Health,* 969 P.2d 416, 418 (Utah 1998). Legislators may decide that a statute should be passed for myriad, often even different, reasons, but where the legislative purpose is expressly stated and agreed to as part of the legislation, we do not look to the views expressed by one or more legislators in floor debates, committee minutes, or elsewhere, in determining the intent of the statute. Because the legislature expressly set forth its intent and purpose in section 78–11–23 in enacting the instant legislation, we do not look at its legislative history. The purpose of the instant statute, as stated in section 78–11–23, is clear and unambiguous: "to encourage all persons to respect the right to life of all other persons, . . . including all persons with a disability and all unborn persons." § 78–11–23 (2002); *see also* § 78–11–23 (2002).

¶ 20 There is no language in the Act limiting a woman's right to choose to abort a nonviable fetus. The statute does not contain language that addresses the ability of a woman to choose an abortion, much less does it contain language that, on its face, restricts that right. The statutory language prohibits one from filing suit to recover damages where the claim is that but for the act or omission of another, the fetus would have been aborted. Given the stated purpose and the text of the Utah Wrongful Life Act, we hold that the legislation was not intended to, and the language does not, on its face, unduly burden the ability of a woman to abort a nonviable fetus.

¶ 21 Whether the statute has the effect of placing a substantial obstacle in the path of a woman seeking to abort a nonviable fetus is a closer question. The statute does create a safe harbor for health care professionals who withhold information which could be used to make a determination on whether or not to abort a nonviable fetus. Nonetheless, we hold that this restriction on the ability to sue for damages does not place a substantial obstacle in the path of a woman wishing to obtain an abortion; we are not convinced that the statute, in practice, places an undue burden on a woman who seeks to abort a fetus.

¶ 22 We disagree with plaintiffs' reasoning that the statute's effect is to obstruct a woman who wishes to terminate her pregnancy from doing so. Plaintiffs reason that because a mother cannot sue her doctor alleging that, had the doctor fully informed her, she would have chosen to abort the fetus, doctors are insulated from some tort liability. Therefore, because doctors are insulated from some "wrongful birth" claims, doctors who disfavor abortion are licensed to withhold information and will not disclose information that they think may persuade a patient to abort. Consequently, according to plaintiffs, because the statute protects some doctors from being sued, and therefore some doctors may knowingly withhold information because they know they are immune from suit, a woman might be deprived of full information, and therefore the statute has the potential effect of unduly burdening the ability to choose an abortion. To us, this possible scenario is too tenuous to hold that the statute has the effect of placing a substantial obstacle in the path of a woman who seeks an abortion.

¶ 23 The statute does nothing to hinder a woman who has made the decision to abort a fetus. The Act did not hinder Marie from aborting Mary Lorraine. Irrespective of the information provided by the doctor, and regardless of the doctor's motivation or intent, had she decided to, she could have aborted the unborn child with no obstruction placed in her way by the statute. Granted, the statute may, given the scenario offered by plaintiffs, immunize some doctors who decide to withhold information from certain types of claims; but if a woman wishes to abort her unborn child, the statute places no limitation on her right to do so. Had Ms. Wood decided to abort her unborn child, though, the statute would not have been a stumbling block burdening her ability to abort.

¶ 24 Nevertheless, assuming that the statute does, in effect, place an obstacle in the way of obtaining an abortion by creating a

situation that permits anti-abortion doctors to withhold information that they believe would influence a woman to abort her unborn child, we are not persuaded that such an obstacle is one that unduly burdens the ability of a woman to obtain an abortion. By prohibiting lawsuits in which plaintiffs allege that but for the negligence of a health care professional or organization the plaintiffs would have aborted a nonviable fetus, we recognize that the statute creates a safe harbor from certain tort actions for doctors who conduct genetic tests and withhold information. These doctors cannot be subject to some suits for withholding information because their patients cannot bring a claim that but for the actions of the doctor withholding material information, they would have aborted the unborn child. Just because the statute may permit such a situation to occur, however, does not convince us that the statute has the effect of unduly burdening the ability of a woman to receive an abortion. Such abortion-averse physicians are not completely immunized from suit. Other causes of action are still available for withholding information. Breach of contract, for example, and other tort claims that do not necessarily allege that but for the act or omission of the doctor the mother would have aborted, may be raised. Moreover, physicians are still accountable for withholding information as they risk professional discipline, including the loss of their license to practice medicine. The statute does not license doctors to withhold information from patients. We disagree with plaintiffs' assumption; just because one cannot sue her physician for wrongful birth—that but for the act or omission of the doctor the unborn child would have been aborted—does not necessarily mean that physicians who disfavor abortion are insulated from accountability, able to withhold information without adverse ramifications, and therefore inclined not to reveal information that would likely influence a woman to abort an unborn child. *See Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 16–17 (Minn.1986) (Simonett, J., concurring specially, joined by Kelly, J., and Coyne, J.) (discussing why the absence of a tort deterrent to malpractice does not necessarily mean doctors will practice less carefully nor does the absence nec-

essarily constitute an intrusion into a person's constitutional right to choose whether or not to have an abortion). Moreover, the legislation likely has no such effect upon physicians who do not disfavor abortion.

¶ 25 Of note to us is that when the Supreme Court declared unconstitutional the spousal notification statute in *Casey* and the partial birth abortion statute in *Stenberg,* the Court gave considerable weight to scientific literature and statistical studies demonstrating the effect the legislation had on abortion rates. The studies supported factual findings made by the trial courts that the respective statutes had the effect of imposing a substantial obstacle. The Court noted in *Casey* that the district court's findings of fact, indicating that women were unlikely to avail themselves of the statutory exceptions to spousal notification, were supported by scientific studies of domestic violence. *Planned Parenthood v. Casey,* 505 U.S. 833, 891, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The Court was persuaded that, based on the extensive scientific and statistical research, because women were unlikely to avail themselves of the exceptions to spousal notification, the exceptions were, in effect, essentially meaningless. *See id.* at 895, 112 S.Ct. 2791. In *Stenberg,* the Court struck down a Nebraska law banning one method of abortion based on scientific statistical studies showing that the ban could have created significant health risks for women who seek abortions. *Stenberg v. Carhart,* 530 U.S. 914, 923–32, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In contrast, neither this court nor the trial court has been presented with anything more than plaintiffs' allegation that their physician withheld information to persuade us that the effect plaintiffs propose—physicians who disfavor abortion are likely to withhold information—is, in effect, an obstacle to obtaining an abortion. The trial court was never presented with any evidence demonstrating the effect the statute has on abortions. Plaintiffs have not presented us with any scientific or statistical support for their argument that the statute necessarily has the effect of burdening the ability of a woman to obtain an abortion. In short, plaintiffs have not sufficiently persuaded us that the statute has the effect of placing a substantial obsta-

cle in the path of a woman seeking an abortion.

¶ 26 Finally, other statutes that, in our view, impose greater burdens on the right of a woman to choose to abort an unviable fetus, have been upheld as constitutional. Legislation requiring, except in a medical emergency, a physician or qualified nonphysician to inform a woman at least 24 hours before performing an abortion of the availability of printed materials regarding childbirth, child support, and adoption, as well as requiring a woman to certify in writing that she was informed of the availability of the materials and was provided them if desired, was not an undue burden. *Casey*, 505 U.S. at 881–87, 112 S.Ct. 2791. Legislation requiring, except in a medical emergency, an unemancipated minor to obtain parental consent, with a judicial approval exception to parental approval, before obtaining an abortion was not an undue burden. *Casey*, 505 U.S. at 899, 112 S.Ct. 2791. To us, this legislation upheld as not unduly burdening a woman's right to choose placed a more substantial obstacle in a woman's path to receive an abortion than does the instant legislation prohibiting actions for wrongful birth. Accordingly, we conclude that section 78–11–24 does not place a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.

¶ 27 Moreover, the legislation in this case is far less of an obstacle to obtaining an abortion and materially different from the legislation declared unconstitutional in *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). The legislation in *Stenberg* prohibited any "partial birth abortion" unless that procedure was necessary to save the mother's life, and it mandated that violation of the statute by a physician resulted in a felony and mandatory revocation of the physician's license to practice medicine. 530 U.S. at 922, 120 S.Ct. 2597. The legislation in *Stenberg* clearly intended to curtail a woman's ability to obtain an abortion, expressly banning a method of abortion. *See id.* at 923, 120 S.Ct. 2597. The Utah Wrongful Life Act, on the other hand, has no intent to curtail a woman's ability to abort a fetus; it prohibits wrongful birth lawsuits after a woman has, in lieu of aborting the fetus, given birth to a child. The *Stenberg* legislation lacked a medical emergency exception, an exception to the prohibition on partial birth abortion permitting physicians to perform the procedure " 'where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother.' " *Id.* at 931, 120 S.Ct. 2597 (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791). The Utah Wrongful Life Act did not include a medical exception because it had no intent to infringe upon the ability of a woman seeking an abortion to obtain one. The U.S. Supreme Court determined that because of the *Stenberg* legislation, some prosecutors "may choose to pursue physicians who use … the most commonly used method for performing previability second trimester abortions," and as a result "[a]ll those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment" resulting in "an undue burden upon a woman's right to make an abortion decision." *Id.* at 945, 120 S.Ct. 2597. The Utah Wrongful Life Act, on the other hand, even though it might result in physicians being immune from some suits, does not, as a result, permit physicians to withhold information with impunity. The Utah Wrongful Life Act does not inhibit the woman's ability to choose to abort an unviable fetus regardless of the accuracy or quality of the medical advice she receives.

¶ 28 In sum, although the statute may create a safe harbor for doctors who withhold information from some patients, the statute does not unduly burden the ability of a woman who wishes to obtain an abortion. The statute does not place any obstacle in the path of a woman who wants to abort an unborn child. Further, even though the possibility exists that a doctor may withhold information and not be subject to certain claims, this potential obstacle is not so substantial that it unduly burdens the right of a woman to choose to terminate a pregnancy.

### B. *Utah Due Process*

¶ 29 For the reasons given above under the federal due process analysis, we conclude that the statute does not violate the Utah Due Process Clause, Utah Const. art. I, § 7.

At this time we do not interpret the Utah Constitution to give any further protection to plaintiffs than does the federal constitution. We note that our state constitution may, under some circumstances, provide greater protections for our citizens than are required under the federal constitution. Nevertheless, in this instance, we find no compelling need to interpret the Utah Constitution differently from the United States Constitution.

## III. EQUAL PROTECTION

¶ 30 Plaintiffs assert the statute violates the federal and state Equal Protection guarantees. According to the plaintiffs, the statute employs classifications that burden the fundamental right to choose an abortion. The statute "singles out the group of parents employing the procreative decision making process whose decision would involve abortion." According to plaintiffs, this classification "target[ing] those who would choose abortion," is not narrowly tailored to achieve a legitimate state interest. The Medical Center insists the statute does not violate equal protection principles because the plaintiffs in this case claiming wrongful birth are not similarly situated to other plaintiffs who claim wrongful pregnancy. The Medical Center avers that the plaintiffs in wrongful pregnancy cases never wanted to become parents, but that parents in wrongful birth cases did want to become parents, just not parents of a disabled child. The Medical Center further argues that even if the groups are similarly situated, the statute was narrowly tailored to achieve the stated legislative purpose of respecting life.

### A. Federal Equal Protection

■■■ ¶ 31 We hold that the Utah Wrongful Life Act does not present equal protection problems and therefore does not violate the Equal Protection Clause. The Act does not involve a suspect or quasi-suspect classification. *See Hickman v. Group Health Plan, Inc.*, 396 N.W.2d 10, 14 (Minn.1986). Plaintiffs allege that the statute "singles out" those who choose to abort an unviable fetus, treating them differently from those who would not so choose. The Supreme Court has not recognized as a suspect or quasi-

suspect class, however, persons who choose to abort an unborn child. Because plaintiffs are not a protected class, we conclude that the Equal Protection Clause does not apply to this case.

### B. Utah Equal Protection / Uniform Operation of Laws

■■■ ¶ 32 Although plaintiffs assert both state and federal equal protection violations, plaintiffs do not offer any different considerations or arguments to distinguish the state guarantee from the federal one. Further, while plaintiffs couch their Utah equal protection argument and Uniform Operation of Laws argument as two separate arguments, we consider them as one argument because the Uniform Operation of Laws provision is, in fact, the Utah equal protection guarantee.

¶ 33 This court has repeatedly considered Article I, section 24, the Uniform Operation of Laws Clause, to be the Utah analogue to the federal due process guarantee. *See, e.g., Kennecott Corp. v. State Tax Comm'n*, 858 P.2d 1381, 1388–89 (Utah 1993) (treating article I, section 24 and Equal Protection Clause as the same); *Greenwood v. North Salt Lake*, 817 P.2d 816, 820 (Utah 1991) ("[Article I, section 24] of the Utah Constitution and the equal protection clause of the Fourteenth Amendment 'embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same.' ") (quoting *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984)); *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 352–56, 369, 379–88 (Utah 1989). However, as we stated in *Malan*, "[t]he different language of Article I, [section] 24, the different constitutional contexts of the two provisions, and different jurisprudential considerations may lead to a different result in applying equal protection principles under Article I, [section] 24 than might be reached under federal [equal protection] law." 693 P.2d at 670. Moreover, while case law developed under the Fourteenth Amendment may be persuasive in applying Article I, section 24, such law is not binding on the state as long as we do not reach a result that

violates the federal equal protection clause. *Id.*

¶ 34 Article I, section 24 of the Utah Constitution provides, "All laws of a general nature shall have uniform operation." Under Article I, section 24, a two-part test is necessary to ensure the uniform operation of the laws: "First, a law must apply equally to all persons within a class. Second, the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute." *Malan v. Lewis,* 693 P.2d 661, 670 (Utah 1984) (citations omitted).

¶ 35 Having explained the difference between federal equal protection and the Utah Uniform Operation of Laws Clause, and having set forth the Uniform Operation of Laws analytical framework, we nevertheless simply hold that we do not recognize persons who choose to have an abortion, as opposed to those who choose not to, to be a class for purposes of the Uniform Operations of Law analysis. At the present we see no reason why persons who would make a particular choice—abortion in this case—should, for constitutional purposes, be recognized as a class and treated any differently from those who would choose otherwise. The right to obtain an abortion, the right asserted by plaintiffs and upon which they claim exercise of should entitle them to additional protection as a class, is properly within the realm of substantive due process, not equal protection. Therefore, we conclude that the Uniform Operation of Laws provision is inapplicable to this case.

## IV. PLAINTIFFS' CLAIMS FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AND FAILURE TO OBTAIN INFORMED CONSENT ARE BARRED BY THE ACT

¶ 36 Plaintiffs claim the district court erred in dismissing their claims for negligent infliction of emotional distress and lack of informed consent as barred by the Utah Wrongful Life Act because, they claim, neither requires proof that plaintiffs would have aborted the child. We conclude that plaintiffs' claims of negligent infliction of emotional distress and lack of informed consent, as pled, are indeed barred by the Utah Wrongful Life Act. We do not decide, however, whether all claims for negligent infliction of emotional distress and lack of informed consent are barred by the Act.

¶ 37 Plaintiffs' allegations of negligent infliction of emotional distress and lack of informed consent have been pled, and cannot be maintained without their argument that but for the act or omission of the Medical Center, Marie would have chosen to abort Mary Lorraine. Indeed, plaintiffs' essential claim, from which these remaining claims flow, is that they were deprived of the opportunity to choose whether or not to abort Mary Lorraine. The claim for negligent infliction of emotional distress "re-aver[s] all allegations previously stated," which include plaintiffs' claims that the Medical Center negligently failed to provide plaintiffs with sufficient information to make an informed decision whether to abort, that because of this negligence Mary was "wrongfully born afflicted with Down Syndrome, and will suffer the effects of that syndrome for the remainder of her natural life," that they incurred the cost of labor and delivery, they are incurring unwanted medical and other expenses related to the care of Mary, and that they will be "unable to live ordinary lives due to the increased attention Mary Lorraine will require." Plaintiffs' claim for failure to obtain informed consent "re-aver[s] all allegations previously stated," those discussed above, and further insists that "[a] reasonable, prudent person or persons in Plaintiffs' position would not have consented to the health care rendered after having been fully informed as to all facts relevant to the decision to give consent." With this claim plaintiffs again specifically allege they were "denied the opportunity to make an informed decision as to the medical care they would receive, and as to the continuation of the pregnancy," and, as a result, they suffer "mental anguish and distress, loss of consortium, costs associated with labor and delivery, extraordinary medical and other related expenses, and the right to lead a normal life." Plaintiffs' causes of action as pled clearly request damages to compensate them for not

being able to choose to abort Mary Lorraine. The Act bars such claims.

## CONCLUSION

¶ 38 The Utah Wrongful Life Act does not violate the Open Courts Clause, the United States or the Utah Due Process Clauses, the United States Equal Protection Clause, or the Utah Uniform Operation of Laws provision, and we therefore uphold the Act as constitutional. Plaintiffs' claim for wrongful birth necessarily includes the allegation that but for the act or omission of the Medical Center, plaintiffs would have aborted Mary Lorraine, and is therefore barred by the Act. Plaintiffs' other claims, as pled, also include the allegation that but for the act or omission of the Medical Center, the plaintiffs would have aborted Mary Lorraine, and are therefore also barred by the Act. Accordingly, the decision of the district court is affirmed.

¶ 39 Associate Chief Justice DURRANT concurs in Justice WILKINS' opinion.

¶ 40 Justice HOWE concurs in the result in parts II and III of Justice WILKINS' opinion.

DURHAM, Chief Justice, dissenting:

¶ 41 I respectfully dissent from the holding of the court on the constitutionality of the Act, and note that Part I of this opinion on the standard of review, having been joined by Justices Howe and Russon, reflects the majority view on that issue.

¶ 42 Additionally, I note a serious flaw in the lead opinion's analysis of the article I, section 11 argument. While the majority of this court upholds a heightened standard of review when section 11 is implicated, the lead opinion has actually analyzed the Utah Wrongful Life Act under a standard that it characterizes as "resolving any reasonable doubts in favor of constitutionality[.]" Maj.

Op. at ¶ 8. This further undermines the legal analysis in this decision and the lead opinion's conclusion that the Act is constitutional.

## I. STANDARD OF REVIEW

¶ 43 In a brief, two-paragraph analysis, the lead opinion has abandoned our carefully crafted and long relied-on analytic model in article I, section 11 cases. The presumption of constitutionality referred to by the lead opinion is a blunt instrument determinative only in cases where no significant constitutional right is claimed to have been abrogated by a statute. The opinion claims that article I, section 11 rights are "no more important and [have] no greater weight as a constitutional provision than other constitutional provisions." The lead opinion's rejection of a heightened level of scrutiny overlooks the fact that article I of the Utah Constitution, known as the "Declaration of Rights," contains affirmative guarantees of specific individual rights that are indeed fundamental. Article I, section 11 rights are no more important than other article I rights, but a cursory examination of the subjects treated therein reveals that most, if not all, of these rights have generated some form of heightened judicial scrutiny. A mere rational basis is insufficient for the legislature to intrude upon or eliminate religious liberty,[1] habeas corpus, *see, e.g., Currier v. Holden,* 862 P.2d 1357, 1363–65 (Utah Ct.App.1993), the right to bear arms, due process of law, *see, e.g., Condemarin v. Univ. Hosp.,* 775 P.2d 348, 356 (Utah 1989), *In re Boyer,* 636 P.2d 1085, 1087–88 (Utah 1981), the rights of accused persons, *see, e.g., In re Criminal Investigation, 7th Dist. Ct.,* 754 P.2d 633, 640 (Utah 1988), unreasonable searches and seizures, *see, e.g., Allen v. Trueman,* 100 Utah 36, 57, 110 P.2d 355, 365 (Utah 1941) (Wolfe, J., concurring), freedom of speech and of the press, *see e.g., West v. Thomson Newspapers,*

---

1. In *Soc'y of Separationists v. Whitehead,* 870 P.2d 916 (Utah 1993), for example, we noted that there is a burden on one who challenges a law on constitutional grounds: "The act is presumed valid and we resolve any doubts in favor of constitutionality." *Id.* at 920. However, the actual analysis undertaken by the court in that case cannot be characterized as anything but heightened scrutiny, given the importance of the "Utah

Constitution's religious and conscience provisions, read in light of the history of the religious conflict that marked the years Utah struggled to become a self-governing state." *Id.* at 940. As we stated, "Government is not to prefer religion to nonreligion, but neither should it be hostile to religion. Religious exercise is to be unfettered, and freedom of conscience is to be supreme." *Id.*

872 P.2d 999, 1019 (Utah 1994), *Kearns–Tribune Corp. v. Lewis,* 685 P.2d 515, 521 (Utah 1984), or the protection against taking private property for public use without compensation, *see e.g., Colman v. Utah State Land Bd.,* 795 P.2d 622, 631. Notwithstanding the presumption of constitutionality we give to statutes, this court has consistently applied various forms of heightened review when article I rights are at issue. The standard of review we have developed in section 11 cases is entirely consistent with that approach and the lead author offers no rationale for changing that standard, although it is clear from his dissent in *Laney v. Fairview City,* 2002 UT 79, ¶ 87, 57 P.3d 1007, that he does not regard article I, section 11 as having any substantive content.

¶ 44 By contrast, our jurisprudence for many decades on this issue has provided a wealth of justification for the standard we have employed. As was stated in *Allen,* 100 Utah at 57, 110 P.2d at 365, "[m]oreover, a court will exercise stricter scrutiny in evaluating measures that encroach upon civil liberties than it will with respect to statutes that impact what can be characterized as only economic interests." (Wolfe, J., concurring). In *Berry ex rel. Berry v. Beech Aircraft Corp.,* 717 P.2d 670, while acknowledging the legislature's wide latitude in "defining, changing, and modernizing the law," with the result at times being the creation of new legal rules and the abrogation of old ones, *id.* at 676, we stated "the basic purpose of Article I, section 11 is to impose some limitation on that power for the benefit of those persons who are injured in their persons, property, or reputations since they are generally isolated in society, belong to no identifiable group and rarely are able to rally the political process to their aid." *Id.* (citation omitted). The limitations placed on the legislature are especially important when it comes to protecting "important individual rights against legislative power" as was intended by the framers who placed article I, section 11 in the Utah Constitution. *Horton v. Goldminer's Daughter,* 785 P.2d 1087, 1093 (Utah 1989).

¶ 45 Article I, section 11 imposes limits on the legislature to protect injured persons who are isolated in society and lack political influence by guaranteeing them access to the courts. *Berry,* 717 P.2d at 676. It does not guarantee individuals "particular, identifiable causes of action as such, but … the availability of legal remedies for vindicating the great interest that individuals in a civilized society have in the integrity of their persons, property, and reputations." *Id.* at 677 n. 4. This court has recognized that "a plain reading" of article I, section 11 "establishes that the framers of the Constitution intended that an individual could not be arbitrarily deprived of effective remedies designed to protect basic individual rights." *Horton* at 1090 (citing *Berry,* 717 P.2d at 675). In fact, the drafters of the Utah Constitution understood that the "normal political processes would not always protect the common law rights of all citizens to obtain remedies for injuries." *Laney,* 2002 UT 79 at ¶ 40, 57 P.3d 1007 (citing *Berry,* 717 P.2d at 676). This court has also held that "[a] constitutional guarantee of access to the courthouse was not intended by the founders to be an empty gesture[.]" *Berry,* 717 P.2d at 675.

¶ 46 Contrary to the position taken by the lead opinion, this court has consistently rejected the presumption of constitutionality of statutes challenged under the remedies clause of article I, section 11. Justice Stewart reasoned that to presume constitutionality when statutes deprive individuals of access to the courts "is to fail to give any greater weight to a constitutional right than to a nonconstitutional interest, such as a general social or economic interest." *Condemarin,* 775 P.2d at 370 (Stewart, J., separate opinion) Justice Zimmerman characterized the nature of the review this way: "Because the interests at stake are specifically protected by the constitution, the presumption of validity that normally attaches to legislative action must be reversed once it is shown that the enactment under scrutiny does, in fact, infringe upon the interests enumerated in article I, section 11." *Id.* at 368 (Zimmerman, J., concurring in part).

¶ 47 In its rejection of a heightened level of scrutiny for article I, section 11 challenges, the lead opinion rejects long-standing prece-

dent. Furthermore, it opens questions about the standards this court has applied to review challenges to all article 1 rights. I believe this approach is incorrect and unwise.

¶ 48 The lead opinion cites three cases for its assertion that a presumption of constitutionality is the applicable standard of review, none of them relevant in my view. The first case is *Zamora v. Draper*, 635 P.2d 78 (Utah 1981), where the court actually used article I, section 11 to avoid a statute depriving a plaintiff of access to the court in some circumstances. *Id.* at 80. In *Zamora*, this court did not strike the statute on its face, but did use article I, section 11 to interject a "higher principle[ ] of justice" that provided the plaintiff a remedy that he would not have had under the statute alone. *Id.* at 81. In essence, the court found the statute unconstitutional as applied under article I, section 11. As *Zamora* stated:

> There are certain principles of law relating to the validity of statutes which have a bearing on the problem of constitutionality here presented. The first and foundational one is that the prerogative of the legislature as the creators of the law is to be respected. Consequently, its enactments are accorded a presumption of validity; and the courts do not strike down a legislative act *unless the interests of justice in the particular case before it require doing so because the act is clearly in conflict with the higher law as set forth in the Constitution.*

*Id.* at 80 (emphasis added) (citations omitted).

¶ 49 The other cases cited by the lead opinion either did not deal with article I, section 11, or, in the case of *Lindon City v. Engineers Const. Co.*, 636 P.2d 1070 (Utah 1981), actually undertook a review of the constitutionality of the Arbitration Act, notwithstanding the observation that "(1) plaintiff does not support the point [on constitutionality] by any substantial meritorious argument, and (2) that many of our sister state courts have held similar acts to be constitutional." *Id.* at 1073. The presumption language in that case goes merely to the point that the burden of convincing the court of unconstitutionality lies with the

challenger, not to the conclusion that the legislature needs no more than a minimal reason for overriding a constitutional guarantee.

¶ 50 Although this court has not recognized the guarantee included in article I, section 11 as "fundamental," as Justice Zimmerman has noted, "I do not think we intended to denigrate the importance of the rights protected from legislative abridgement by article I, section 11." *Condemarin*, 775 P.2d at 367 (Zimmerman, J., concurring in part). This court has wisely avoided the "analytical straitjacket" of federal equal protection analysis by avoiding a rigid test that dictates that some rights are fundamental and others are not. *Id.* Instead, regarding article I, section 11 rights, this court should examine in an individualized inquiry whether a legislative enactment denies a litigant "a remedy by due course of law" in order to determine whether article I, section 11 applies to the case at hand. *Horton*, 785 P.2d at 1090 (citing *Berry*, 717 P.2d at 675).

## II. ARTICLE I, SECTION 11

¶ 51 Article I, section 11 of the Utah Constitution, states that

> All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have a remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

¶ 52 This clear language "guarantees access to the courts and a judicial procedure that is based on fairness and equality," and prevents arbitrary deprivation of "effective remedies designed to protect basic individual rights." *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 675 (Utah 1985). This clause is not an "empty gesture," but was intended to guarantee a judicial remedy for injury to one's person, property or reputation. *Id.*

¶ 53 The constitution leaves room for the legislature to define, change and modernize the law, but article I, section 11 limits the

legislature's power to eliminate a remedy unless the legislation is consistent with the two-part standard established in *Berry*. 717 P.2d at 675–76 (recently upheld in *Laney v. Fairview City*, 2002 UT 79, 57 P.3d 1007). First, the law must provide the injured person "an effective and reasonable alternative remedy 'by due course of law' for vindication of his constitutional interest." *Berry*, 717 P.2d at 675–76. This benefit must be "substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different." *Id.* at 680 (citations omitted). Second, if there is "no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." *Id.*

¶ 54 The Utah Wrongful Birth Act (the "Act"), enacted in 1983, states in part that "[a] cause of action shall not arise, and damages shall not be awarded, on behalf of any person, based on the claim that but for the act or omission of another, a person would not have been permitted to have been born alive but would have been aborted." Utah Code Ann. § 78–11–24 (2002). The constitutionality of this Act must be reviewed under the *Berry* test.

¶ 55 The first step in deciding whether the Act violates the constitutional guarantee of a remedy is to determine whether the Act abrogated an existing legal remedy. *Berry*, 717 P.2d at 677 n. 4, 680; *Day v. State ex rel. Dep't. of Pub. Safety*, 1999 UT 46, ¶ 38, 980 P.2d 1171, 1184. Therefore, the question is whether a legal remedy for wrongful birth existed in Utah in 1983 when the Act was passed.

¶ 56 In this inquiry, the majority opinion rejects plaintiffs' argument that the Act abolished the right to claim negligence against a medical provider who gives erroneous medical advice to a patient who, based on that erroneous advice, decides to proceed with a pregnancy and then delivers a disabled child. The majority concludes that the Act did not abolish an existing legal claim or remedy. I disagree. The majority opinion has ignored the fact that article I, section 11 is "not concerned with particular, identifiable causes of action, but rather with the availability of legal remedies to vindicate individuals' interests in the integrity of their persons, property and reputations." *Currier v. Holden*, 862 P.2d 1357, 1360–1 (Utah Ct.App.1993), *cert. denied, McClellan v. Holden*, 870 P.2d 957 (Utah 1994) (quoting *Berry*, 717 P.2d at 677 n. 4); *see also Craftsman Builder's Supply v. Butler Mfg.*, 1999 UT 18, ¶ 53, 974 P.2d 1194, 1209 (Stewart, J., concurring) (noting "Section 11 protects a citizen's right to a remedy rather than *causes of action as such* [.]") (emphasis added).

¶ 57 Here, plaintiffs were injured in person and property. First, their personal right to make informed, lawful decisions regarding medical treatments and procedures as subverted by the admitted negligence of the defendant. Second, the Act has precluded them from pursuing any remedy for that harm. The right to be compensated for a personal injury is a property right that requires access to the courts for enforcement. *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 354, 360 (Utah 1989). The label placed on an injury is not its most important characteristic. It is irrelevant what the exact injury is called if it causes injury to person and property. This court's inquiry should not be so superficial as to begin and end with whether or not, on the day the Act was passed, there was a specific cause of action entitled "wrongful birth." The inquiry must focus on the nature of the harm and the recognition that it was, and is, cognizable at law. Therefore, the court should not focus merely on the "wrongful birth" label, but rather on legal remedies vindicating the right to receive correct and complete medical information in relation to pregnancy-related choices. For example, if the Act eliminated the right to sue for negligent treatment in all open heart procedures, or for failure to obtain informed consent in the course of heart treatment, no one would be likely to argue that "heart-related malpractice claims" were a special category of injury. The question here is whether the plaintiffs have a fundamental

legal remedy for harm caused by another's negligence. Whether the injury is labeled negligence leading to the loss of an informed decision (medical malpractice) or inability to terminate the pregnancy (wrongful birth) is irrelevant. Both constitute injuries that necessitate the availability of legal remedies, and therefore access to the courts, to vindicate a lawful interest.

¶ 58 The "wrongful birth" cause of action is nothing more than a legal remedy for medical malpractice based on negligence. *Payne ex rel. Payne v. Myers*, 743 P.2d 186, 188–89 (Utah 1987) (stating that "[i]n an action for wrongful birth, the plaintiff has the burden of establishing" traditional elements of negligence). In fact, many courts have recognized "wrongful birth" as a simple medical malpractice claim, resulting from negligence. *See Bader, Northeast Indiana Genetic Counseling, Inc. v. Johnson*, 732 N.E.2d 1212, 1216 (Ind.2000) (stating that it is unnecessary to "characterize the cause of action here as 'wrongful birth' since labeling the cause of action as 'wrongful birth' adds nothing to the analysis, inspires confusion and *implies the court has adopted a new tort*") (emphasis added); *Garrison v. Med. Ctr. of Delaware, Inc.*, 581 A.2d 288, 290 (Del.1990) (the cause of action need not be characterized as "wrongful birth" since it falls within the realm of traditional tort and medical malpractice law); *Arche v. U.S. Dept. of Army*, 247 Kan. 276, 798 P.2d 477, 479 (1990) (applying medical malpractice and a negligence analysis, with standard elements of negligence, to wrongful birth claim); *Harbeson v. Parke–Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483, 493 (1983) (en banc) (holding action for wrongful birth "fits within the conceptual framework of our law of negligence").

¶ 59 The majority opinion notes that this court has acknowledged that "other states that had considered wrongful birth claims were almost unanimous in their recognition of a cause of action where it was alleged that but for negligence, the parents would have terminated a pregnancy." Maj. Op. at ¶ 14. (citing *C.S. v. Nielson*, 767 P.2d 504, 506 n. 4 (Utah 1988); *Payne*, 743 P.2d at 188–89 n. 5). However, the majority opinion does not acknowledge that in a 1988 decision, *five years*

*after* the Act was passed in 1983, this court assumed, albeit without specifically deciding, that a wrongful birth cause of action already existed in Utah. *Payne*, 743 P.2d at 188 n. 5. In *Payne*, plaintiffs alleged wrongful birth and the court found that a duty existed that the doctors may have breached in providing negligent medical advice regarding potential birth defects of a fetus. *Id.* at 189–90. After finding a duty and a possible breach, this court concluded that the "[p]arents had a remedy against the state defendants for injuries arising out of the negligent acts of State employees...." *Id.* at 190. Finally, this court held that "the parents were not denied the guarantees of article I, section 11 because [when their wrongful birth claim arose] they *still had an opportunity to seek redress in the courts.*" *Id.* (emphasis added). Specifically, the *Payne* court observed that the parents in that case "had a remedy against the ... defendants for injuries arising out of ... negligen[ce]," i.e., their claim for wrongful birth, but that their failure to follow procedural requirements extinguished the claim. "Had they [given timely notice of claim], they might have obtained judgment...." *Id.*

¶ 60 The court in *Payne* expressly held that a duty existed in the parental counseling context. Justice Howe, for a unanimous court, wrote:

> The increased ability of health care professionals to predict and detect the presence of fetal defects and the capacity to assess risk factors associated with unborn and even unconceived children have considerably enhanced the importance of genetic counseling.... Courts accordingly have recognized that physicians who perform testing and provide advice *relevant to the constitutionally guaranteed procreative choice* ... have a corresponding obligation to adhere to reasonable standards of professional performance.

*Id.* at 189 (emphasis added).

¶ 61 Even after the Act was passed, courts, including Utah's Court of Appeals, have concluded that *Payne* implicitly recognized the cause of action for wrongful birth as a logical extension of mainstream medical malpractice law. *Payne*, 743 P.2d at 188 n. 5. *See State*

*v. Shipler*, 869 P.2d 968, 970 (Utah Ct.App. 1994) (noting that in *Payne*, this court held that "in an action for wrongful birth ..., the Utah Supreme Court held that the causes of action did not accrue until the birth of the gravely ill child[.]"); *Arche v. U.S. Dept. of Army*, 247 Kan. 276, 798 P.2d 477, 479 (1990) (citing *Payne* for the proposition that Utah recognizes wrongful birth causes of action). Regardless of whether this court explicitly held that "wrongful birth exists in Utah," this court did state that the plaintiffs could have brought their wrongful birth cause of action in that case, had their claim been timely. *Id.*

¶ 62 In addition, Utah has joined the majority of jurisdictions that have recognized an action for the closely related claim for wrongful pregnancy. "Wrongful pregnancy" denotes parents "bring[ing] a claim on their own behalf for the monetary and emotional damages they suffered as a result of giving birth to a normal and healthy but unplanned and unwanted child."[2] *C.S. v. Nielson*, 767 P.2d 504, 506 (Utah 1988) (citations omitted). Such actions are based upon a "negligently performed or counseled sterilization procedure or abortion, or negligence in preparing or dispensing a contraceptive prescription." *Id.* at 506. In *Nielson*, the court also noted that courts "have been almost unanimous in their recognition of a [wrongful birth] cause of action against a physician or other health care provider where it is alleged that but for the defendant's negligence the parents would have terminated the congenitally or genetically defective fetus by abortion." *Id.* at 506 n. 4. *Nielson* did not except Utah from that list.

¶ 63 Assuming, arguendo, that it is unclear whether in 1983 this court recognized a "wrongful birth" cause of action, we must examine whether a broader claim for medical malpractice existed in Utah in 1983 that vindicated the same rights. I conclude that it did. Wrongful birth is a garden-variety medical malpractice claim requiring the usual elements of negligence. There is no question that a claim for medical malpractice existed in 1983 for medical malpractice based on negligence. *See Reiser v. Lohner*, 641 P.2d 93, 98 (Utah 1982) ("It is a settled rule that the physician must inform the patient of all substantial and significant risks that may occur before operating on him ... and the resultant injury must have been proximately caused by the procedure administered"). Thus, a claim for medical malpractice that vindicated the same rights as a "wrongful birth" cause of action was recognized in 1983 and is protected by the constitution.

¶ 64 The next inquiry is whether the Act provides an effective and reasonable alternative remedy for the remedy eliminated. Under the first prong of the *Berry* test, article I, section 11 "is satisfied if the law provides an injured person an effective and reasonable alternative remedy 'by due course of law' for vindication of his constitutional interest." *Berry*, 717 P.2d at 680. Here, the Act provides no effective or reasonable alternative remedy. In fact, unlike Berry, *Horton, Sun Valley,* and *Craftsman* (all article I, section 11 challenges to statutes based on statutes of limitation or statutes of repose), or *Condemarin* (an article I, section 11 challenge based on a liability cap for medical malpractice), the Act provides *no* remedy whatsoever, completely cutting off an injured plain-

---

**2.** The court in *Nielson* distinguished between wrongful pregnancy, wrongful life and wrongful birth actions in the following way:

'Wrongful pregnancy,' or 'wrongful conception' as it is occasionally termed, refers to those cases where parents bring a claim on their own behalf for the monetary and emotional damages they suffered as a result of giving birth to a normal and healthy but unplanned and unwanted child. Such actions are usually based upon a negligently performed or counseled sterilization procedure or abortion, or negligence in preparing or dispensing a contraceptive prescription.... 'Wrongful birth,' on the other hand, refers to

the cause of action whereby parents claim they would have avoided conception or terminated an existing pregnancy by abortion but for the negligence of those charged with, among other things, prenatal testing or counseling as to the likelihood of giving birth to a physically or mentally impaired child. 'Wrongful life' is the corresponding action by or on behalf of an impaired child alleging that but for the medical professional's negligence, the child would not have been born to experience the pain and suffering associated with his or her affliction or impairment.

*C.S. v. Nielson*, 767 P.2d 504, 506 (1988) (citations omitted).

tiff's access to the courts. *See Craftsman,* 1999 UT 18, ¶¶ 19–23, 974 P.2d 1194; *Condemarin,* 775 P.2d 348; *Horton v. Goldminer's Daughter,* 785 P.2d 1087 (Utah 1989); *Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son, Inc.,* 782 P.2d 188 (Utah 1989); *Berry,* 717 P.2d 670 (Utah 1985). The majority opinion acknowledges that the Act may create a "safe harbor" for doctors from "certain professional malpractice claims." Maj. Op. at ¶ 13.

¶ 65 In *Nielson* this court acknowledged that "[t]he failure to recognize a cause of action against a physician who negligently performs surgical sterilization procedures would be a grant of absolute immunity to a physician whose negligence results in injury to the patient." *Nielson,* 767 P.2d at 506 (citations omitted). The court declined to grant medical providers such broad immunity and saw "no reason why a physician who performs such surgery [sterilization] should be held to a lesser standard of care than a physician or surgeon who performs any other surgical procedure." *Id.* at 508. This court also warned that "[s]uch a ruling could lead to a decrease in the standard of care, and would leave victims of professional negligence without a remedy' " violating article I, section 11. Id. *Nielson's* reasoning applies equally to plaintiffs' claims of negligent testing and counseling.

¶ 66 The only major difference between *Nielson* and the instant case is that in *Nielson* the negligence occurred in the provision of information about sterilization prior to birth and in this case the negligence occurred in the provision of genetic counseling prior to birth. In both cases, the essence of the claim is that the parents received negligent medical advice, leading to the birth of a child who would not have been born but for the negligent advice. However, under the Act and the majority's holding, in cases of wrongful pregnancy a plaintiff has a remedy, whereas in cases of wrongful birth the remedy has been completely eliminated. This result is unfair; some victims of medical malpractice have remedies and others do not, even when the nature of the malpractice and of the injuries is identical. Ms. Nielson knew of her alleged injury regarding the negligent

conveyance of information at the time she became pregnant, and therefore she could sue. Ms. Wood, on the other hand, *could not know* about the alleged negligently provided information until *after* she gave birth, and she cannot. Under the reasoning of the *Nielson* court, there is no reason for the discrepancy. Because no alternative remedies exist for medical negligence resulting in birth of a physically or mentally impaired child where the parents were denied information in the choice to terminate the pregnancy, the Act fails the first prong of the *Berry* test.

¶ 67 The second prong of the *Berry* test states that "if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective." *Berry,* 717 P.2d at 680. This prong requires a balancing test "wherein the exigencies associated with the 'social or economic' evils addressed by legislation must be weighed against the reasonableness of its intrusion upon personal rights." *Condemarin,* 775 P.2d at 360. Completion of this balancing test requires an examination of the Act in question as well as an examination of legislative history.

¶ 68 On its face, this act does not identify a social or economic evil to be eliminated. Where no evil is identified, the court should look to the "obvious purpose" of the legislation. *Horton,* 785 P.2d at 1094; *Ross v. Schackel,* 920 P.2d 1159, 1166 (Utah 1996). From the language of the Act and from its history, it is clear that its purpose was to eliminate or reduce opportunities for the exercise of the lawful choice to abort a fetus with a prenatally diagnosed defect. *See Utah Legislative Survey: Wrongful Life and Wrongful Birth* (hereinafter "Wrongful Life"), 1984 Utah L.Rev. 221, 224 n. 747. However, since the right to choose whether or not to abort is statutorily protected in Utah, Utah Code Ann. section 76–7–302, as well as part of a fundamental right to privacy under the United States Constitution, *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), it

cannot be considered a "social evil" for the purposes of article I, section 11.[3] Since there is no other evil identified, the Act does not eliminate a social evil and does not satisfy the second prong of the *Berry* test. Additionally, since there is no evil that was eliminated with the Act, there is no need to examine whether the elimination of the existing legal remedy was an arbitrary or unreasonable means for achieving the objective.

¶ 69 In sum, the Act fails the *Berry* test. First, it precludes a remedy for wrongful birth based upon negligence, yet provides no alternative remedy. Second, the Act attempts to discourage an act that is constitutionally and statutorily protected by placing a significant burden on its exercise. The Act therefore violates article I, section 11 of the Utah Constitution.

## III. DUE PROCESS

¶ 70 The majority opinion holds that the legislature's refusal to permit recovery for wrongful birth is permissible in that its action does not interfere with federal or state constitutional due process. I disagree.

### A. Federal Due Process

¶ 71 *Roe v. Wade* established a woman's right to an abortion as a right of privacy founded in the First, Fourth, Fifth, Ninth, and Fourteenth amendments, as well as in the penumbra of the Bill of Rights. 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Since *Roe*, the United States Supreme Court has held that the right of a woman to terminate her pregnancy is specially protected by the Due Process Clause. *Planned Parenthood v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion); *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (adopting *Casey* purpose and effect test in majority opinion). *Casey* established that a law that infringes on a woman's right to abortion is unconstitutional if it has the "*purpose* or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. 2791 (emphasis added). An obstacle is substantial if it is "calculated [not] to inform a woman's free choice, [but to] hinder it." *Id.*

¶ 72 The *Casey* court also noted that a law with such a purpose would be invalid "because the means chosen by the State to further the interest in potential life *must be calculated to inform the woman's free choice, not hinder it.*" *Id.* at 877, 112 S.Ct. 2791 (emphasis added). In fact, the *Casey* Court repeatedly emphasized that informed choice was central to a woman's liberty interest, going so far as to encourage legislation "aimed at ensuring a decision that is mature and informed." *Id.* In short, if a law has an improper purpose in hindering a woman's free choice in obtaining an abortion, such as the Utah Wrongful Life Act, it violates the Due Process Clause of the United States Constitution and is invalid. *Id.* at 877.

¶ 73 Here, the purpose of Utah's Wrongful Life Act is to discourage and burden a woman's choice to obtain an abortion; the Act serves to interfere with the provision of accurate and correct information regarding the health of a fetus. It also improperly aims to reduce or eliminate abortion, which becomes obvious when examining its legislative history.

¶ 74 The majority opinion notes that "[t]he statute's purpose is not to unduly burden the ability of a woman to abort an unviable fetus, but to prevent lawsuits for wrongful birth and thereby 'encourage all persons to respect the right to life of all other persons.' " Maj. Op. at ¶ 18 (citation omitted). It then con-

---

**3.** However morally reprehensible abortion may be to many people, for religious or other reasons, the United States Constitution protects the right of individuals to seek its use for reasons that are sufficient to the person making the choice. Many would disagree about the morality of aborting a fetus with a severely defective condition, or a milder one. Even more would disagree about terminating a pregnancy to avoid having a child of one gender or the other. The federal constitution does not permit the state to regulate such personal, individual moral choices, however. Interestingly, international ethical norms assert that abortion for gender selection is unethical and a violation of human rights, whereas there is no similar view of abortion for the prevention of genetic and other birth defects. *See* Adrienne Asch, *Prenatal Diagnosis and Selective Abortion: A Challenge*, 89 Am. J. Pub. Health 1646 (1999).

tends that it "need not examine the legislative history of th[is] statute to discover the legislative intent." Maj. Op. at ¶ 19. It also opines that "where the legislative purpose is expressly stated and agreed to as part of the legislation, we do not look to the views expressed by one or more legislators in floor debates, committee minutes, or elsewhere, in determining the intent of the statute." *Id.* Therefore the court holds that the statute is facially constitutional.

¶ 75 The majority opinion disregards, in my view, the appropriate test for determining whether a statute has a constitutionally improper purpose. While the opinion correctly states that as a general rule legislative history is relevant only where statutory language is ambiguous, this rule does not apply where the purpose of a statute is alleged to determine its constitutionality. In fact, the United States Supreme Court has ignored the general rule in the area of abortion as well as other areas. *Edwards v. Aguillard,* 482 U.S. 578, 586, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). To determine if a statute has an improper purpose, a court must look beyond the statute's unambiguous language to the legislative history. *Id.* at 594–95, 107 S.Ct. 2573 (noting that a finding of improper purpose is determined by analyzing the statute on its face as well as its legislative history). This is especially true when analyzing the legislative purpose under the *Casey* purpose prong. *See generally Jane L. v. Bangerter,* 102 F.3d 1112, 1116 (10th Cir.1996) ("A forbidden purpose may be gleaned both from the structure of the legislation and from examination of the process that led to its enactment."); *Richmond Med. Ctr. For Women v. Gilmore,* 55 F.Supp.2d 441, 486 (E.D.Va. 1999) ("under *Casey,* the legislative intent behind the enactment is a pertinent inquiry").

¶ 76 In fact, the United States Supreme Court has even noted that a court does not need to accept a legislature's express and unambiguously stated purpose if the legislative history shows that the proffered purpose was not sincere, but merely a sham. *Edwards,* 482 U.S. at 586, 107 S.Ct. 2573 (finding statute unconstitutional after legislative history revealed that legislature's stated purpose in statute was not sincere). *See also Bangerter,* 102 F.3d at 1116 (striking down a Utah statute with a preamble that expressly declared the statute's purpose was protecting lives and the right to life of unborn children and holding that limiting availability of abortions after twenty weeks gestational age to only three narrow circumstances was unconstitutional).

¶ 77 I disagree, moreover, with the majority opinion's conclusion that the Act expresses an allegedly proper and unambiguous purpose. The Act's plain language eliminates a cause of action that would otherwise exist but for the link between the cause of action and abortion. The text of the Act [4] states that its purpose is to "encourage all persons to respect the right to life of all persons ... including all unborn persons." Utah Code Ann. § 78–11–23 (1983). The Act bans all actions based on negligence where birth occurred instead of an abortion.

¶ 78 Looking at the statute as a whole, it seeks to "respect the life of 'unborn persons' " by immunizing medical care providers from liability for negligent, reckless or intentional acts only when those acts *prevent* abortions from occurring. This language demonstrates quite clearly that the purpose of the Act is to reduce or eliminate abortion, even at the cost of standards of due care for medical care providers. Although the language of the Act does not explicitly state that its purpose is to reduce abortions, the only available inference from connecting the first

4. The language of the Act is as follows:

The legislature finds and declares that it is the public policy of this state to encourage all persons to respect the right to life of all other persons, regardless of age, development, condition or dependency, including all handicapped persons and all unborn persons.

A cause of action shall not arise, and damages shall not be awarded, on behalf of any person, based on the claim that but for the act or omission of another a person would not have been permitted to have been born alive but would have been aborted.

The failure or refusal of any person to prevent the live birth of a person shall not be a defense in any action, and shall not be considered in awarding damages or child support, or imposing a penalty, in any action.

Utah Code Ann. § 78–11–23–25.

and second sections of the Act is that there is such an unconstitutional motive. The purpose of the Act is to respect the lives of the unborn, but its provisions can have no effect other than to reduce abortion or at least to penalize its use. Therefore, the text of the Act taken as a whole reflects an improper purpose.[5]

¶ 79 Besides the improper purpose inherent in the structure and text of the statute itself, legislative history conclusively demonstrates that its purpose was to place an obstacle in the path of those choosing to abort. The due process challenge to this Act will be no surprise to its drafters as the legislature's general counsel explicitly recognized that this statute could be challenged on due process grounds. Materials of Legislative General Counsel on S.B. 149 (general counsel commenting in the Legislative Approval letter that he would "imagine a challenge to this [S.B. 149] as being a violation of due process, and perhaps equal protection"). As noted above, this court must look to the legislative history to discover if the expressed purpose was in fact the true purpose or merely a sham. Legislative history indicates that the purpose behind the Act was to eliminate wrongful life actions which have four "frightening implications." Materials of Legislative General Counsel on S.B. 149. *See also Wrongful Life, supra* ¶ 67, at 224 n. 747 and accompanying text; Salt Lake Trib., June 20, 1999, at C7 (quoting Lynn Wardle, the Act's drafter, as stating "there are a lot of people who believe abortion is an abhorrent moral crime, so the purpose was to protect them from being forced by pressures to be collaborators or accomplices in something they find morally abhorrent.").[6] Two of the four frightening implications were that the wrongful life concept may "eliminate virtually all handicapped children" and "increase the inci-

dence of sex-selection abortions." *Id.* (noting that "if an obstetrician/gynecologist knows he may be sued for [wrongful birth] he'll find it in his best interests to ensure that handicapped newborns (who somehow slip through the screening programs) do not survive").[7] By naming two extreme examples of what people can legally do under the current abortion regime, the drafter indicates his disapproval of these types of abortions and attributes them to the wrongful life concept. *Id.* (noting also that the wrongful life concept "treats babies as manufactured products and prenatal screening as quality control"). By noting the nexus between wrongful life actions and sex-selection abortions or defective fetus abortions, the drafter of the Act was clearly trying to reduce these types of abortions by eliminating the remedy of wrongful life. Even if it were true that pre-natal testing increases the number of abortions, which it is not, this purpose is still improper under the *Casey* purpose prong.

¶ 80 The Act's legislative history also indicates that the drafters intended the Act to interfere with parents becoming "informed" regarding the health of their fetus. According to a proponent instrumental in drafting the Act, it was passed because of an emerging trend in genetic testing. *See* Materials of Legislative General Counsel on S.B. 149; *Wrongful Life, supra* ¶ 67, at 224 n. 748 and accompanying text. The proponents reasoned that if wrongful birth actions were allowed, physicians would routinely perform genetic testing in order to avoid malpractice suits. The proponents feared that routine genetic testing encouraged abortions by "informing parents" of the test results. *Wrongful Life, supra* ¶ 67, at 224 n. 748 and accompanying text. Thus, to discourage testing and eliminate the repercussions of not informing parents, the legislature passed the

---

5. If the purpose of the Act was really to prevent punishing doctors who did not want to perform abortions the Act would have codified the right to refuse to perform an abortion without eliminating a person's right to judicial redress for injury caused by medical malpractice. *See* 42 U.S.C. § 300a–7 (Supp.2002).

6. Ironically, studies have shown that diagnosing fetal conditions has actually reduced the number of pregnancy terminations, as many women in the high risk category would have terminated a

pregnancy had they not known the health of their fetus. *The Pro–Life Bonus of Amniocentesis,* 302 New Eng. J. Med. 925 (1980) (noting that the increased availability of prenatal testing has led many women who would not have considered having children to get pregnant).

7. This statement, of course, is tantamount to an assertion that negligent physicians are likely to be murderers as well.

Act anticipating that the uninformed parents would not choose to abort. *Id.* This purpose—to eliminate informed choice—attempts to "place a substantial obstacle in the path" of exercising a fundamental right to make an informed decision regarding the reproductive process. Further, the Act not only violates *Casey* by hindering the ability to obtain correct and accurate information, but it actually attempts to hinder a woman from exercising the informed choice to abort a child. Therefore, the Act's purpose violates the *Casey* test.

¶ 81 Since a law is unconstitutional if it has the purpose *or* effect of placing a substantial obstacle in the path of a woman seeking an abortion, there is no reason to examine whether the effect of this statute was improper. However, since the majority opinion considered the question of whether the statute had an improper effect a "closer question," I will discuss this prong as well. Maj. Op. at ¶ 21. I point out, however, that this discussion is necessarily limited because of the procedural posture of the case. The trial court dismissed this action and granted judgment on the pleadings. Thus, no record has been developed on the effect of the Act.

¶ 82 The effect of the Act substantially obstructs and burdens a woman's exercise of an informed decision to terminate a pregnancy. It allows information regarding the health of a fetus to be negligently or intentionally withheld without consequences. This information is so integral to informed choice that its omission burdens the right to make an informed decision to abort. *See* Julie F. Kowitz, *Not Your Garden Variety Tort Reform: Statutes Barring Claims for Wrongful Life and Wrongful Birth are Unconstitutional under the Purpose Prong of Planned Parenthood v. Casey,* 61 Brooklyn L.Rev. 235, 265 (1995).

¶ 83 The Act shields physicians and other healthcare providers from liability for failing to provide accurate, medically correct information to their patients. It removes a significant deterrent to the provision of incorrect information, a deterrent function that is at the core of all American tort law. *See, e.g., Bowman v. Davis,* 48 Ohio St.2d 41, 356 N.E.2d 496, 499 (1976) ("For this court to

endorse a policy that makes physicians liable for the foreseeable consequences of all negligently performed operations except those involving sterilization would constitute an impermissible infringement of a fundamental right."). The Act, through removal of this deterrent, sends a message condoning, if not encouraging, violations of the right to choose abortion by permitting physicians to negligently withhold information relevant to the choice. As Justice Howe observed in *Payne,* "Courts accordingly have recognized that physicians who perform testing and provide advice relevant to the constitutionally guaranteed procreative choice ... *have a corresponding obligation to adhere to reasonable standards of professional performance.*" *Payne,* 743 P.2d at 189 (emphasis added). The majority concludes that the Act does not create a "safe harbor for health care professionals who withhold information" because it is likely that other claims and professional discipline may result from *intentionally* withholding information. Maj. Op. at ¶¶ 21, 24 (noting breach of contract as an example of a claim that may still exist). The problems associated with the regulatory process and/or criminal remedies are entirely unaddressed by this record, and I cannot agree that the majority's assertion is accurate. Furthermore, the Act also creates a safe harbor for doctors who *negligently* provide information regarding the health of the fetus that may still infringe upon a woman's right to make an informed choice regarding a pregnancy, as was alleged here.

¶ 84 In addition, the majority opinion goes on to say that "just because one cannot sue her physician for wrongful birth ... [does not necessarily mean that physicians who disfavor abortion] are therefore inclined not to reveal information that would likely influence a woman to abort an unborn child." Maj. Op. at 22 (citation omitted). In essence, this is an argument that the Act will not induce doctors to practice less carefully or to withhold information from women seeking abortion. Of course, I agree that though the Act may not induce doctors to intentionally withhold information, it nonetheless insulates them from liability for providing negligent information. This undermines a fundamental

theory of tort law, that the imposition of sanctions on negligent behavior will deter such behavior. Further, even the drafters of the Act recognized that it would have some effect on doctors, since they purported to draft it in part to protect anti-abortion doctors from having to perform prenatal tests that would reveal information about the health of a fetus. Materials of Legislative General Counsel on S.B. 149.

¶ 85 In addition, the majority opinion notes that the Act does nothing to hinder a woman "who has made the decision" to abort a fetus; this observation misses the point. Maj. Op. at ¶ 23. The point is that the Act condones the placing of substantial obstacles in the path of one seeking to make an informed decision about an abortion. Therefore, in addition to the Act's purpose to prevent abortions, its effect is to obstruct the right to informed reproductive choice. Accordingly, the Act creates an undue burden on constitutionally guaranteed rights, violates due process principles, and is unconstitutional.

¶ 86 Justice HOWE concurs in Part I of Chief Justice DURHAM's dissenting opinion.

RUSSON, Justice, concurring in Chief Justice DURHAM's opinion:

¶ 87 I concur in Chief Justice Durham's dissenting opinion. In my view, the central consideration in this case is the preservation of a patient's ability to make informed medical decisions and choices based on full, open, and frank information from and discussions with his or her physician. In that regard, the cause of action presented in this case should be characterized as one for simple medical malpractice negligence arising out of the hospital's alleged failure or delay in informing the patient of the results and interpretation of certain genetic tests in connection with a pregnancy.

¶ 88 Justice Wilkins' analysis concerning whether Utah recognized a cause of action for wrongful birth prior to the enactment of the Utah Wrongful Life Act ("Act") is too formalistic in its insistence that a particular label (here "wrongful birth or life") attached to a cause of action must have been specifically and explicitly adopted by this court in

order for that cause of action to be said to have been recognized in Utah. What is determinative in this case, and in any case, in the application of the *Berry* test's threshold question of whether a statute abrogates an existing cause of action is the nature of the cause of action, not the label placed on the cause of action.

¶ 89 Here, plaintiffs have brought a cause of action that, while termed "wrongful birth," simply pleads a claim for medical malpractice or negligence. This case is no different than a run-of-the-mill medical malpractice suit. Prior to the enactment of the Act, a plaintiff who was negligently given incomplete or inaccurate information by a physician upon which information she relied in making an informed choice about a particular medical procedure or treatment could maintain an action against the physician for medical malpractice or negligence if the physician's negligence was the proximate cause of an injury to her. The same should be true in this case.

¶ 90 In the instant case, plaintiffs allegedly were given delayed, incomplete, or incorrect information about genetic test results related to a pregnancy. The allegedly incorrect information or lack of information influenced the couples' medical decision regarding whether to continue the pregnancy, proximately resulting in some harm to them. In any other medical context concerning any other medical condition or procedure, such circumstances would presumably support a cause of action for medical malpractice negligence. The fact that this case involves the controversial issue of abortion does not and should not affect the characterization of the cause of action or the legal analysis used to arrive at that characterization.

¶ 91 Because the cause of action stated in this case is one for simple medical malpractice negligence, a cause of action clearly recognized in Utah prior to the enactment of the Act, and because the Act abrogates totally that cause of action, the Act must pass muster under the *Berry* test to be constitutional.

¶ 92 I agree with Chief Justice Durham's *Berry* analysis and her resulting conclusion that the Utah Wrongful Life Act is an unconstitutional violation of article I, section 11 of the Utah Constitution. Therefore, I would

hold that the Utah Wrongful Life Act does not bar Wood's complaint, the trial court's grant of judgment on the pleadings was error, and the case should be remanded for further proceedings consistent with this opinion and Chief Justice Durham's dissent.